## ELMER L. STYLES *vs.* GEORGE F. TYLER.

First Judicial District, Hartford, May Term, 1894. ANDREWS, C. J., TORRANCE, FENN, BALDWIN and HAMERSLEY, Js.

The Supreme Court of Errors, as established by the Constitution of this State, is a court of last resort for the correction of errors, and its jurisdiction as described in the Constitution relates to the determination of principles of law and not to the trial or retrial of pure questions of fact.

In view of such jurisdiction chapter 174 of the Public Acts of 1893 cannot be construed as requiring this court to determine, upon evidence spread upon the record, questions of pure fact settled by the judgment of the trial court.

Effect, however, is given to the Act by construing it as authorizing this court to correct the finding of the trial court by taking into consideration such facts, not included in the finding, as the record shows to have been found by the trial court and essential to the presentation of questions of law arising in the case. As thus construed the Act extends and enlarges the operation of § 1141 of the General Statutes providing for the correction of appeals.

The memorandum of reasons for decision filed by the trial court and printed with the record, although not strictly a part of it, constitutes the official opinion of that court, and may properly be used as a basis for stating the questions of law it is desired to raise upon appeal; and if the facts and legal conclusions drawn therefrom, or applied in the determination of the facts, are stated in such opinion, error in the law so announced may be claimed and the appellant, upon a proper request, is justly entitled to a finding containing all the facts in sufficient detail to clearly present such claim upon the record.

The appellant made a written request to the judge to incorporate in the finding the facts stated in the "Reasons for Decision," but did not otherwise specify such facts. *Held* that in view of the fact that there had been no practice under the Act the court would not be justified in refusing the appellant redress for the want of such formality.

Section 4 of the Act provides that the trial court shall state in writing on the margin of each paragraph of such request whether the fact stated therein was or was not proven. *Held* that the unexplained failure of the court to make any note upon the appellant's request to find as proven the facts which the court stated in its opinion were proven and formed the grounds of its judgment, must be taken as equivalent to a formal note that such facts were proven, where that opinion, certified by the judge, was printed with the record under a rule of this court.

In an action by a physician to recover the value of professional services

rendered, the value to be proved by him is the ordinary and reasonable price for services of that nature; but he is not bound to prove the value of the services to the defendant. And where the defendant relies upon evidence of want of ordinary care and skill in the treatment of the case in defense of the action and by way of counterclaim for damages, the burden of proof in establishing such negligence rests upon him.

[Argued May 3d—decided July 9th, 1894.]

ACTION to recover the value of professional services rendered by the plaintiff as a physician and surgeon ; brought before a justice of the peace and thence by defendant's appeal to the Court of Common Pleas for Hartford County, where the case was tried to the court, *Calhoun, J.;* facts found and judgment rendered for the defendant, from which the plaintiff appealed for alleged errors in the rulings of the court as to questions of law, and also upon the ground that the conclusions of the trial court as to questions of fact were clearly against the weight of evidence. *Error and new trial granted.*

The " Reasons for Decision " were as follows :—

" On the 21st day of April, 1891, the plaintiff was employed by defendant to treat, as a surgeon, a fracture of the femur of the left leg of the defendant's boy, then a little over two years of age.

" The implied promise of the plaintiff upon this employment was to treat said case with ordinary and reasonable skill and care.

" He has brought his action on the common counts, and to recover must show affirmatively that he fulfilled his own agreement aforesaid, and thus rendered his services as a surgeon for the defendant of value.

" On the trial it was not questioned that on May 21st the boy's thigh bone was so bent as to require a further surgical operation to reduce it to its proper line. This was done by Dr. Sweet, who charged for his services $35.00.

" If the plaintiff left the bone in the condition above mentioned, it is admitted that he did not use reasonable and ordinary care and skill in the case; but he claims to have done so, and that the condition of the boy's femur must have been

caused by some serious injury after his own duty had been properly done.

"To accept this theory without any direct proof and in the face of the testimony of the defendant and his wife as to the care with which the boy was preserved from any accident, would require extraordinary confidence in the statements and surgical skill of Drs. Styles and Bunnell.

"But when five witnesses have testified that this bend in the bone (or leg) was noticed by them presently on the removal of the splints, and their descriptions of it substantially coincide with that of Dr. Sweet, I must conclude that it was not the result of any injury received by the boy *after* he was discharged by the plaintiff.

"Another important question is, when was the boy taken to the plaintiff's office—the 15th or the 21st of May?

"If on May 21st, the plaintiff's claim of subsequent injury cannot stand, for both he and Dr. Bunnell declare there had been no change in the position of the bone from May 12th, when the splints were removed, to the date of the office inspection.

"And the testimony which fixes the date of that inspection as May 21st (the day the boy was taken to Hartford), decidedly overbalances that of the plaintiff and Dr. Bunnell, which names May 15th. True, the plaintiff associates that inspection with another surgical operation which was performed on the 15th.

"But there is nothing but memory to verify the association, and the plaintiff may, and quite honestly, be mistaken. Dr. Bunnell gave no special reason which I recall for remembering the date.

"The parents, in a matter so important to them, could hardly err in their recollection. They ought to know better than any other persons whether they took their child to Hartford the same day he was in the plaintiff's office. They say they did, and in this statement the grandfather and Mrs. Atkinson corroborate them.

"And if this is so, then the opinions of even so competent and candid an expert as Dr. Cook must yield to proved facts,

and it is still more improbable, and, I might say, almost impossible, that the boy received any subsequent injury, and I must decide that the plaintiff has failed to support his claim for compensation for his services, having failed to perform his promise in the case of the defendant's child.

"I design to cast no further imputation on the ability of the plaintiff as a surgeon than my decision in this case implies. I suppose that skillful surgeons may err in judgment or care.

"I must reject the counterclaim of the defendant, for there is no evidence that he has suffered any damage or been put to extra expense by the plaintiff's failure to perform his contract, and, if he has, there are no data from which the court can determine the amount.

"February 3, 1894. CALHOUN, J."

The finding of facts was as follows:—

"1. On the 21st of April, 1891, the plaintiff was employed as a professional surgeon by the defendant to reduce a fracture of the left femur of the defendant's boy, then a little over two years of age.

"2. On said day the plaintiff accepted said services and commenced, as surgeon, to treat said fracture, and continued so to do until May 12, 1891, when he voluntarily ceased to attend the boy for the purpose aforesaid.

"3. The plaintiff treated said fracture with such lack of ordinary care and skill that he left said femur unnaturally bent.

"4. The defendant was consequently compelled to employ another surgeon to reset said bone and to place it in its proper condition.

"5. The services of the plaintiff above mentioned, and for which this suit was brought, were of no value to the defendant.

"6. On the trial no question of law was ruled adversely to the plaintiff.

"February 19, 1894. CALHOUN, J."

The other facts are sufficiently stated in the opinion.

. *William F. Henney*, for the appellant (plaintiff).

I. The court erred in holding that the burden of proof was upon the plaintiff, a practicing physician and surgeon, to show that he treated the case with ordinary skill and care. It is apparent from the opinion of the trial court filed and printed with the record, that in reaching its conclusions the court so held. The defendant relied on alleged negligence of the plaintiff as a defense, and the law is well settled that the burden of proving negligence is upon the party alleging it. Wait's Actions and Defences, Vol. 3, p. 620, and cases there cited. In a late Maryland case the court held that in an action against a physician for negligent treatment the burden of showing such negligence is on the plaintiff. *State* v. *Housekeeper*, 70 Md., 162 ; *Holtzman* v. *Hoy*, 91 Ill. App., 459 ; *Baird* v. *Morford*, 25 Ia., 531 ; *Vanhoover* v. *Berghoof*, 90 Mo., 487 ; *Craig* v. *Chambers*, 7 Ohio St., 253 ; *Leighton* v. *Sargent*, 31 N. H., 119 ; *Garruy* v. *Stadler*, 67 Wis., 512 ; *Gibbon* v. *Budd*, 2 H. & C., 92 ; 1 Greenleaf on Evidence, 14th Edition, § 81 ; Wharton on Evidence, Vol. 1, p. 357.

II. The burden being on the defendant on the question of negligence, it was incumbent on him to show that the injury complained of was not occasioned by some occurrence subsequent to Dr. Styles's treatment. " A physician's title to remuneration does not depend upon whether or not he has effected a cure, if he has used due care and diligence." Encyclopædia of Law, Vol. 18, p. 441 ; *Hupe* v. *Phelps*, 2 Stark., 480 ; *Gallaher* v. *Thompson*, Wright (Ohio), 466 ; *Ely* v. *Wilbur*, 49 N. J. L., 685.

III. There is no proof of a special contract as alleged in the third defense, such as would shift the burden of proof in the case at bar. " An allegation that a surgeon was engaged ' to set and reduce the said fracture * * * and to tend it, and cure and heal the same for a fee, and the said defendant entered upon such retainer and employment,' implies no more than that the surgeon would bring to bear a reason-

able degree of care and skill as a surgeon in the undertaking." *Hoopingarner* v. *Levy*, 77 Ind., 455.

IV. The court should have noted on the margin of paragraph 1 of the proposed finding whether it found the facts referred to in that paragraph proven or not proven. Public Acts, 1893, p. 318, § 4.

*Charles H. Briscoe*, for the defendant (appellee).

I. No question of law was contested on the trial. The only questions were questions of fact. 1. Did the plaintiff treat the fracture with such lack of ordinary care and skill that he left the bone unnaturally bent? 2. Was the defendant consequently compelled to employ another surgeon to reset the bone and place it in proper condition? 3. Were the services of the plaintiff of any value to the defendant? All of these questions the trial court very properly decided against the plaintiff.

II. The court correctly laid down the rule as to the burden of proof. Upon a *quantum meruit* the plaintiff must prove: 1. That he was retained to do the work by the defendant. 2. He must prove the work done and give general evidence of its being well done. 3. He must prove the price or value of the work. 1 Archibald's Nisi Prius, 310, 311. The mere fact that the law *implies* in the contract of a surgeon that he will perform his duty with ordinary care and skill, furnishes no reason for any change in the requirements of proof. 1 Chitty on Pleading, 102; Deering on Negligence, 232 and cases cited; *Blair* v. *Bartlett*, 75 N. Y., 151, 152; *Landon* v. *Humphrey*, 9 Conn., 216; *Wilmont* v. *Howard*, 39 Vt., 445; *Haythorne* v. *Richmond*, 48 Vt. 557; *Slake* v. *Baker*, 2 Wils., 359; *Seare* v. *Prentice*, 8 East, 352; *Beck* v. *German Klinik*, 78 Iowa, 696. The court could not find from any evidence the plaintiff put in in chief that the services were of any value.

III. The court did not err in failing to note whether the facts referred to in the first paragraph of the proposed finding were proven or not proven, inasmuch as the plaintiff did not conform to the statute in his request. He did not

designate the specific facts which he asked the court to find. Pub. Acts, 1893, p. 318, § 2.

IV. In this case the court having made its finding, that finding like the verdict of the jury should stand. " A new trial for a verdict against evidence will be granted only when manifest injustice has been done by the verdict, and when the wrong is so plain and palpable as to exclude all reasonable doubt of its existence; and clearly to denote that some mistake has been made by the jury in the application of legal principles or to justify the suspicion of corruption, prejudice or partiality in the triers." *Waters* v. *Bristol*, 26 Conn., 404 *; Daley* v. *Norwich & Worcester R. R.*, id. 591 *; Sharon* v. *Salisbury*, 29 Conn., 117 ; *Derwort* v. *Loomer*, 21 Conn., 252; *Potter* v. *Paine*, id., 376 ; Public Acts, 1893, 319, § 9.

HAMERSLEY, J. This is an action brought by a practicing physician and surgeon to recover of the defendant the price of professional services rendered. The defendant answers by a general denial, and also sets up special defenses, of which only one affects the questions before us, and that one alleges that the plaintiff was a practicing physician and surgeon, and as such undertook to reduce a fracture of the thigh bone of the defendant's infant child, and performed the operation negligently and without reasonable skill; and that by reason of the plaintiff's negligence and lack of reasonable skill his services were of no value to the defendant. The court below rendered judgment for the defendant. The plaintiff appealed.

The finding of facts states that the plaintiff treated the fracture with such lack of ordinary care and skill that he left the bone unnaturally bent, and that the services of the plaintiff were of no value to the defendant. Upon such finding there is clearly no error.

There is printed with the record the " reasons for decision" signed and filed by the trial judge when judgment was rendered. It appears from these reasons that the court did not find any specific negligence or lack of skill on the part

of the plaintiff, but inferred error in judgment or care amounting to lack of reasonable and ordinary care and skill, from the fact that after the operation was completed and the splints removed the bone was so bent as to require a further surgical operation, which was done by another physician ; that the splints were removed May 12th, and the bent condition of the bone was not certainly ascertained until May 21st ; that the plaintiff claimed to have left the bone in good condition on May 12th, and that any bending discovered on May 21st must have resulted from some intervening accident, and was in no way attributable to the plaintiff, while the defendant claimed that the leg appeared to be bent on May 12th; that the court held as a rule of law that the burden of proof was on the plaintiff to show affirmatively that he treated the case with ordinary and reasonable skill and care, and that the court applied this rule as to burden of proof in determining the preponderance of evidence as to the main fact of the plaintiff's lack of care and skill, including the subordinate fact of the appearance of the leg on May 12th.

This statement of reasons, although printed with the record in pursuance of a rule of this court, is not strictly a part of the record. It is, however, the official opinion of the court below and as such belongs to the case. It may properly be used by counsel as a basis for his statement of the questions of law he desires to raise upon appeal. When a judgment is rendered the trial judge is not bound to state, either orally or in writing, the reasons for his decision ; but when he sees fit in announcing his decision to give such reasons, and states the facts as he finds them and the conclusions of law he draws from the facts, or the rules of law he has applied in determining the facts, we think counsel are justly entitled to claim error in the law so announced, and to have a finding containing the facts in sufficient detail to clearly present such claim upon the record ; and the difficulty of applying an effective remedy when a trial judge refuses to make a proper finding in such case is doubtless one reason that induced the enactment of the recent statute,

(Public Acts 1893, page 318) upon the construction of which this case depends.*

The record, in addition to the plaintiff's request for a finding under the provisions of General Statutes, § 1132, with the statement of the questions of law arising thereon which

---

* SECTION 1. Upon the trial of any civil action to the court without a jury, in which an appeal to the Supreme Court of Errors may now be taken, each party may request the judge to incorporate in the finding such facts as he claims to be proven by the evidence.

SEC. 2. Such requests shall be in writing, stating the facts claimed to be proven, and each shall be in a separate paragraph, and each paragraph numbered.

SEC. 3. Such requests shall be filed with the clerk, within two weeks after judgment, and become a part of the record of the case.

SEC. 4. The court shall state in writing on the margin of each paragraph of such requests whether he finds such paragraph proven or not proven.

SEC. 5. Whenever the court shall make a finding in any case, each fact therein stated shall be in a separate paragraph and each paragraph numbered.

SEC. 6. Either party may, within five days after receipt of notice that the finding has been filed with the clerk, file written exceptions to any finding of fact by the court, and to any refusal to find a fact requested, in accordance with the provisions of section four, and all the evidence claimed by either party to be material to such question or questions of fact shall, so far as the court shall find the same to have been actually given in the case, be made a part of the record in the case.

SEC. 7. Either party may appeal, from any finding or refusal to find any fact, to the Supreme Court of Errors in the manner now by law provided.

SEC. 8. The expense of printing evidence, printed in accordance with the request of the parties, shall be paid by the party so requesting the same, at the rate of one dollar per printed page for one copy, and such expense, not exceeding the sum of fifty dollars, may be taxed in favor of the prevailing party.

SEC. 9. The Supreme Court shall review all questions of fact raised by the appeal as well as all questions of law, and in all cases where no evidence has been improperly admitted or excluded in the trial court, shall determine the questions of fact and law and render final judgment thereon. In passing upon said questions of fact, said Supreme Court shall not reverse the finding of the trial court upon any question of fact, unless it find the conclusions of such trial court upon such question clearly against the weight of evidence.

SEC. 10. The rights of appeal under this act shall be in addition to those now provided by law, and the provisions of this act shall apply to all suits now pending.

SEC. 11. This act shall take effect upon its passage.

Approved, June 6, 1893.

he wishes to have reviewed, contains the plaintiff's request to the judge to incorporate in the finding the facts he claims to be proven by the evidence, including the facts found in the judge's reasons for decision ; the plaintiff's exceptions to the finding of facts by the court, and to the refusal of the court to find the facts requested; and all the evidence claimed by either party to be material to such questions of fact and found by the court to have been actually given in the case. In his appeal the plaintiff assigns as reasons for appeal, the alleged error of the court before stated as to the rule of burden of proof, and adds certain reasons for appeal on questions of fact. The plaintiff claims judgment in his favor because the conclusions of the court below upon the pure issues of fact are clearly against the weight of evidence, and also because the court in reaching its conclusions of fact adopted an erroneous rule as to the burden of proof. Both claims are made under the Act of 1893, and the record is made up in pursuance of that Act.

The first claim involves the question, does the Act require this court to determine, upon the evidence spread upon the record, questions of pure fact settled by the judgment of the trial court, and, upon reaching conclusions inconsistent with that judgment, either to reverse the judgment for error in finding one or more facts, or to render a new judgment as upon the trial of the whole cause, and issue execution thereon?

The second claim involves the question, does the Act authorize this court to correct the finding of the trial court by taking into consideration such facts, not included in the finding, as the record shows to have been found by the court and to be necessary for the presentation of questions of law arising in the case ?

At this term and the preceding term the construction of the Act has been ably argued by counsel, including some who took part in the preparation and passage of the Act ; and the different views presented indicate that the profession is uncertain what the Act means, and how it affects their duties in the trial of causes. In view of this condi-

tion, we think the essential questions relative to the effect of the Act which are directly involved in the present case should be fully considered and settled.

*First:* Does the Act of 1893 require this court to determine, upon evidence spread upon the record, questions of pure fact settled by the judgment of the trial court?

In 1834, Chief Justice DAGGETT in delivering the opinion of the court in *Weeden* v. *Hawes,* 10 Conn., 54,—Judge PETERS a member of the Constitutional Convention of 1818 concurring, and Judge CHURCH another member of that convention being then a member of the court, though not present when the case was decided,—said that this court was a court of errors and had " no constitutional power to decide a question of fact." And in 1867 this court expressed the opinion that " it was the intention of the framers of the Constitution that the Supreme Court of Errors should be a court for the correction of errors *in law.* The language used clearly imports this, and such has ever been the understanding of the legislature, of the courts, and of the people of the State." *Dudley* v. *Deming,* 34 Conn., 169, 174. We did not in that case discuss the reasons for the opinion given, but we are now satisfied of its correctness after a careful re-examination of the provisions of the Constitution.

The second article provides that " the powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one ; those which are executive, to another ; and those which are judicial, to another."

Article fifth provides :—

" Sect. 1. The judicial power of the State shall be vested in a Supreme Court of Errors, a Superiour Court, and such inferiour courts as the General Assembly shall, from time to time, ordain and establish : the powers and jurisdiction of which courts shall be defined by law.

" Sect. 2. There shall be appointed in each county a sufficient number of justices of the peace, with such jurisdiction. in civil and criminal cases as the General Assembly may prescribe.

" Sect. 3. The judges of the Supreme Court of Errors, of the Superiour and inferiour courts, and all justices of the peace, shall be appointed by the General Assembly, in such manner as shall by law be prescribed. The judges of the Supreme Court, and of the Superiour Court, shall hold their offices during good behaviour; * * * all other judges and justices of the peace shall be appointed annually."

Do these provisions mean that the judicial power of the State in the final correction of errors in law is vested in this court? In passing on a principle of constitutional law we may properly consult the decisions of the courts of our sister States and derive great assistance from their conclusions, which in doubtful cases might be controlling; but in ascertaining the real meaning of our Constitution little aid can be obtained from such sources. A Constitution, our own especially, is the outgrowth of a people's history, the result of past experience and of existing conditions, and it is impossible to ascertain its real meaning without studying the conditions it was framed to meet and the fundamental principles it was adopted to secure. " The meaning of the Constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it." Cooley, Constitutional Law, 4th Ed., page 55.

Our Constitutional Convention met in 1818. At that time eighteen States had adopted constitutions. Our system of judicature was quite different from that of nearly all these States, and in its treatment of the judicial department our Constitution differed widely from most others. In New York the Constitution of 1777 did not vest the judicial power in any specified courts, and in prescribing a court for the correction of errors provided that it shall be instituted " under the regulations which shall be established by the legislature." In Massachusetts the Constitution of 1780 did not attempt to vest the power in constitutional courts. In New Hampshire, by the Constitution of 1784, the legislature had full " power and authority to erect and constitute judicatories and courts of record or other courts." In Ohio the Constitution of 1802 gave to the legislature full power to prescribe the

jurisdiction of the Supreme Court. Indeed, there is no one of the States where the existing organization of courts and the language of the Constitution in relation to the judicial department can fairly be held analogous to our own.

In 1818 we had a judicial system peculiar to ourselves which was the growth of one hundred and eighty years. It had one fatal defect: our government was a democracy, exercising unrestricted power through representatives chosen annually; there was no restraint from any fundamental law, because each year the representatives chosen by the people exercised the same sovereign power by which every so-called fundamental law was enacted. In the assembly of representatives was concentrated all political power; absolute power of legislation, supreme executive power, supreme judicial power in the administration and construction of all laws. Our security rested, not on a Constitution as now understood, but on the annual election by which the people retained all power in their own hands, and so it was expressed in the preamble to our declaration of rights as enacted in 1776. " The People of this State, having from their Ancestors derived a free and excellent Constitution of Government, whereby the Legislature depends on the free and annual Election of the People, they have the best Security for the Preservation of their civil and religious Rights and Liberties."

But such a condition was fatal to the permanence and independence of the judiciary. The Assembly had gradually delegated its judicial power to courts. It had built up a judicial system admirably adapted to the needs of the people. But the jurisdiction and existence of the courts, as well as the tenure of office of the judges, was wholly dependent upon the action of each annual Assembly. To remedy this defect was one main object of the Constitution. The revisers appointed to adapt our laws to the changes made by the Constitution say: " The most prominent advantages derived from it, are, that it divides the government into three branches, a legislative, an executive, and the judiciary, which are confided to separate magistracies; and also secures the independence of the judiciary, by a permanent appointment."

Styles *v.* Tyler.

The General Court or Assembly originally exercised all
judicial power; the first step towards the establishment of a
regular judicature was the delegation to "assistants," mem-
bers of the General Court, of power to hold "particular"
courts; the establishment of counties was accompanied by
the establishment of County Courts, first held by these as-
sistants. Shortly after the Charter of Charles II. was grant-
ed the laws were revised, and the Revision of 1672 was
published. Our judicature then consisted of the Particular
Courts called Courts of Assistants, with full appellate juris-
diction for the retrial by jury or otherwise of all cases, and
original jurisdiction in all "Tryals for Life, Limb, Banish-
ment and Divorce;" and County Courts with original ju-
risdiction of "all Causes civil and criminal, not extending to
Life, Limb or Banishment." In 1718 a new edition of the
laws was published; another step in the development of our
system had been taken; the jurisdiction of the Court of As-
sistants was vested in a court formally established as the
"Superiour Court of Judicature over this Colony," to con-
sist of a chief judge and four other judges; the County
Courts were formally established as the "Inferior Courts of
Judicature or County Courts," and also described as the
"county or inferiour courts within this colony," with the
same jurisdiction before exercised; courts of probate were
also established, originally held by one of the judges of the
County Courts.

In 1783, upon the close of the Revolution, Richard Law
and Roger Sherman were appointed to revise our laws in
view of the changes caused by the successful issue of the
struggle and our establishment as an independent State; the
Revision of 1784 was the result of their labors. In estab-
lishing the judicatory the system of the colony is made that
of the State. "There shall be a Superior Court of Judica-
ture over this State;" the inferior courts are the same, and
the jurisdiction of all courts substantially the same except
that the jurisdiction in equity before exercised solely by the
General Assembly is vested in the Superior Court when the

value of the matter in demand does not exceed 1600 pounds, and in the County Courts when it does not exceed 100 pounds.

The same year (1784) that this revision was adopted the last step in completing our system was taken. The Superior Court had full and final appellate jurisdiction, directly or indirectly, from all inferior courts including justices of the peace, but the General Assembly was the *dernier* resort for correction of errors in law. This evil was now largely remedied; the "Supreme Court of Errors" was established as "the dernier resort of all Matters brought by way of Error, or Complaint from the Judgment or Decree of the Superior Court (and by force of the appellate jurisdiction of that court from the judgment of all inferior courts), in Matters of Law or Equity, wherein the Rules of Law or the Principles of Equity appear from the Files, Records and Exhibits of said Court, to have been erroneously or mistakenly adjudged and determined. And said Supreme Court are hereby impowered, authorized and enabled to take Cognizance of all such Causes that shall be brought before them as aforesaid, and shall be invested with all the Powers, Authorities and Jurisdictions necessary and requisite for carrying into complete Execution all their Judgments, Decrees and Determinations in the Matters aforesaid, according to the Laws, Customs and Usages of this State, And their determinations and Decrees shall be final and conclusive to all concerned." (Ed. 1786, page 266.)

This original description of the essential character of the jurisdiction and power of the Supreme Court of Errors has remained unchanged by statute for more than one hundred years; the condensation of expression adopted in the Revision of 1875 (Tit. 4, Ch. 4, Sec. 2) was not intended to and did not alter the settled legal description. That the court was established with the deliberate purpose and intent that, in connection with the appellate jurisdiction of the Superior Court, supreme except in matters of law, a foundation should be so laid for a permanent system of judicature and jurisprudence, is indicated by the statute passed at the same time, "that it shall be the Duty of the Judges of the Superior

Court in all matters of Law by them decided on Writ of Error, Demurrer, special Verdict or Motion in arrest of Judgment, each one to give his Opinion seriatim, with the Reasons thereof, and the same reduced to Writing and subscribed; to be kept on File; that the Case may be fully reported, and *if removed by Writ of Error, to be carried up with greater advantage; and thereby a Foundation be laid* for a more perfect and permanent System of common Law in this State. And it shall be the Duty of the Supreme Court of Error to cause the Reasons of their Judgments to be committed to writing and signed by one of the Judges, and to be lodged in the Office of the clerk of the Superior Court." (Ed. 1786, page 267.) And prior to this time the policy had been adopted of trying, with consent of the parties, questions of fact to the court. (Ed. 1786, p. 5.)

The most significant feature in the establishment of the court is found in the fact that it was the deliberate adoption into our system of judicature of the fundamental principle, which has ever since characterized it, that the certainty of our jurisprudence as well as the security of parties litigant depends upon confining the jurisdiction of a court of last resort to the settlement of rules of law. The protest of the law of 1784 was not so much against the personnel of the General Assembly as a court of last resort, as against the jurisdiction exercised; the personnel of the General Assembly for the trial of causes was substantially the same as that of the new court; the judgment of the General Assembly was practically the judgment of the lieutenant governor and council, and the same officers were made judges of the Supreme Court of Errors; but sitting as members of the General Assembly their jurisdiction extended over the whole range of fact, and their judgments were liable to be mere arbitrations; while sitting as members of the Supreme Court of Errors their jurisdiction was confined to questions of law arising upon facts found by the Superior Court as the court of last resort for all matters of fact, and their judgments became the solemn and final declaration of the law which must be the same for all parties and every case; so that the

law of 1784 was more than the creation of a court; it was the declaration and adoption of a principle deemed vital to our judicial system. The only material change made prior, to the adoption of the Constitution was in 1806, when it was provided that the Superior Court should consist of a chief judge and eight assistant judges, and that the judges of the Superior Court, any five of them to make a quorum, should constitute the Supreme Court of Errors. (Comp. 1808, page 218.)

The legislature had now done nearly all in its power to do in providing for a permanent judicial system; it had delegated to regular courts most of its judicial power; it had settled the jurisdiction of those courts upon principles proved by experience to be essential to the best administration of justice, but the fatal defect still remained—remediless except by constitutional change. The judicial power was only delegated; it still belonged to the legislature, and its exercise could be assumed at any moment and in any case; the jurisdiction, the existence of every court, the tenure of office of every judge, the finality of every judgment, was still at the mercy of each legislature. In 1815 there occurred an illustration of this defect that had a considerable influence in securing the remedy; the General Assembly annulled the judgment and set aside the sentence pronounced against a murderer convicted at a special session of the Superior Court. The following year Chief Judge SWIFT, who had presided at the trial, published a vindication of the action of the court, with observations on the constitutional power of the legislature. In this pamphlet stress was laid upon the danger of the legislature encroaching upon the jurisdiction of the judiciary, because the legislature " would become one great arbitration that would ingulf all the courts of law and *sovereign discretion* would be the rule of decision, * * * a state of things equally favorable to lawyers and criminals." *Peter Lung's* case, and the observations of Chief Judge SWIFT, added much strength to the long and earnest agitation for the protection of a Constitution which two years later resulted in the convention of 1818. But the

evil which *Lung's* case emphasized was not more the wrong of the exercise of such jurisdiction by the legislature than the wrong of such jurisdiction. The underlying principle involved was that the administration of justice is not safe when the court of last resort for the settlement of the law, in the exercise of an absolute and final power, can render judgment on facts and law so intermingled that its decision is not simply the declaration of the law but may become the arbitration of the case.

It is difficult to imagine a more striking proof of the reality of the evil which the people sought to prevent by article 5 of our Constitution, than is furnished by the law under discussion, if the construction claimed for it is correct. By its provisions as construed, every case tried to the court, in the Superior Court, in six County and District Courts, and in thirteen or more City Courts, may be brought directly to this court, and we may render a judgment in the exercise of a power which is final beyond all review upon all questions of law and fact, the facts being such facts as the court below has found, and such facts as the court has been asked to find but has not found, supported by such bits of testimony actually given as the lawyers see fit to print; and this judgment may be an affirmance or reversal of the judgment below, or a new and independent judgment for such amount of damages or for such other relief as we may deem just. It is too plain for argument that, under the progressive influence of such legislation, nothing but more than human wisdom and firmness on the part of its judges can prevent a court exercising such a jurisdiction from eventually becoming " one great arbitration that would ingulf all the courts of law, and sovereign discretion would be the rule of decision."

The Constitution of 1818 must be read in connection with this peculiar development and existing condition of our judicature, and in view of the special defects it was adopted to remedy; so read the provisions of the fifth article become clear and specific. The whole judicial power of the State is vested in the courts; that power is fully granted and is

subject to no limitations except those contained in the Constitution itself; inferior courts may be from time to time ordained and established by the legislature in accordance with the public needs as developed by future changes; and inferior courts are courts inferior to the Superior Court, exercising portions of that jurisdiction vested in the Superior Court, subject to such apportionment. Two courts are established and the character of their jurisdiction described by the Constitution itself; one with a supreme jurisdiction in the trial of causes, and one with a supreme and final jurisdiction in determining in the last resort the principles of law involved in the trial of causes. The "Superior Court" is a "Superior Court of Judicature over this State" with a supreme jurisdiction original and appellate over the trial of all causes not committed to the jurisdiction of inferior courts. The "Supreme Court of Errors" is not a supreme court for all purposes, but a supreme court only for the correction of errors in law; if its jurisdiction also included the determination of facts it would then be supreme for all purposes and its name a misnomer. It cannot be claimed that the designation of these courts is a mere meaningless name with no effect whatever, and leaves the apportionment of jurisdiction to the uncontrolled discretion of the legislature; but if such claim is baseless, if the phraseology of the Constitution is descriptive of jurisdiction, then it clearly follows that the character of the jurisdiction so described must be sought in the meaning attached to the language used at the time it was employed by the people who used it for the purpose of such description.

This rule was applied by Chief Justice MARSHALL in construing the term "levying war" as used in our Federal Constitution. After speaking of the natural import of the term he says : " But the term is not for the first time applied to treason by the Constitution of the United States. It is a technical term. It is used in a very old statute of that country, whose language is our language, and whose laws form the substratum of our laws. It is scarcely conceivable that the term was not employed by the framers of

Styles *v.* Tyler.

our Constitution in the sense which had been affixed to it by those from whom we borrowed it. So far as the meaning of any terms, particularly terms of art, is completely ascertained, those by whom they are employed must be considered as employing them in that ascertained meaning, unless the contrary be proved by the context. It is therefore reasonable to suppose, unless it be incompatible with other expressions of the Constitution, that the term " levying war " is used in that instrument in the same sense in which it was understood, in England and in this country, to have been used in the statute of 25 Edward III., from which it was borrowed." *Burr's Trial,* Robertson's Ed., Vol. 2, pp. 496, 497 ; *Goddard* v. *State*, 12 Conn., 451. The term " Supreme Court of Errors " now under discussion was a technical term and had a completely ascertained meaning when employed by the people of Connecticut in their Constitution ; of this there can be no doubt.

The judges and statesmen who framed the Constitution, and the people who adopted it, knew but one meaning for " a Supreme Court of Errors ; " it was a phrase peculiar to our people and unknown elsewhere ; the Supreme Court of Errors then existing had been created, had been named and assigned its jurisdiction and powers to accomplish an express purpose and to cure an express evil developed by our peculiar experience. It expressed the conviction of the people that a jurisdiction of mixed law and fact vested in any court of last resort, exercising a supreme and uncontrolled power, was inconsistent with a sound system of jurisprudence and was dangerous to the administration of justice ; and to prevent the future exercise of such jurisdiction was one main reason why the convention was called, and one main object sought to be secured in framing the Constitution.

There is no escape from the conclusion that the Constitution vested in this court a portion of the judicial power, that it specified the power so vested, and that the power so specified is a supreme and final jurisdiction for the correction of errors in law.

The claim is made that the words which follow this grant,

to wit : " the powers and jurisdiction of which courts shall be defined by law " annul the grant; that the direction to define the practical limits of a jurisdiction of a specified character granted in general terms, is equivalent to a grant of power to change or alter at pleasure the essential character of the jurisdiction itself. It is very clear that these words will bear no such interpretation. A power to define is different from a power to grant or apportion; and however far the meaning of the word " define " might be extended when the context clearly calls for extension, it is certain that when used with reference to a jurisdiction substantially described, its meaning must be confined to fixing limits for the exercise of such jurisdiction, and cannot be extended to an alteration of its character. Assuming that these words apply to the Supreme Court of Errors, and that their effect cannot be exhausted in determining the jurisdiction apportioned between the various inferior courts and between the Superior Court and the inferior courts, it is quite doubtful if the words contain or imply the grant of any power; such grant is certainly unnecessary, for the power expressly given the legislature to ordain and establish courts inferior to the Superior Court involves, beyond all doubt, the power to apportion the jurisdiction vested in the Superior Court between that court and courts inferior to it, as well as between such inferior courts ; and the general power of legislation in respect to procedure and the whole body of the law involves the power, subject to the restrictions of the Constitution, to define limits for the exercise of the jurisdiction vested in all courts ; so that it may well be that these words, as their form indicates, are simply a direction that the law shall at all times clearly define the limits of the powers and jurisdiction exercised by all courts ; by those courts upon which jurisdiction may be conferred by the legislature in accordance with the jurisdiction so conferred, and by those courts whose jurisdiction is derived directly from the Constitution in accordance with the jurisdiction so granted. If these words can authorize the alteration of the jurisdiction of courts as described in the Constitution, then words in the

following section, much broader in their scope and far clearer in their meaning, must be equally efficacious. Section 2 provides : " There shall be appointed in each county a sufficient number of justices of the peace, with such jurisdiction in civil and criminal cases as the General Assembly may prescribe." Here a free hand is given the legislature to confer on justices any jurisdiction whatever. Can the legislature appoint one or more justices in each county with supreme appellate jurisdiction in all causes civil and criminal tried within the county ? This certainly cannot be ; and cannot be because the phrase in section 2, as well as the phrase in section 1, is used in subordination to the jurisdiction of the Supreme Court of Errors and the Superior Court as granted and described.

If confirmation were needed of the views now expressed, it will be found in a contemporaneous construction by the legislature in establishing this court after the Constitution was adopted—a construction which has been unquestioned by court or legislature to the present time. The duty of maintaining the jurisdiction thus described was imposed upon the judges of this court; and such jurisdiction has been maintained and its character stated in an unbroken line of decision for seventy-five years.

The judicial power committed to the court was intended to secure the people against a mixed jurisdiction they deemed unwise and unsafe; that power has come to us undiminished ; and, inasmuch as it is again challenged in this case, we have deemed it proper to restate fully and clearly as we can the reasons for the view which has heretofore influenced our decisions, and which in *Dudley* v. *Deming* was treated as too plain for argument.

The force given to a description of jurisdiction in a Constitution is illustrated in the opinion prepared by Chief Justice TANEY in the case of *Gordon* v. *United States*, and published after his death with the approval of the court : " Its jurisdiction and powers and duties being defined in the organic law of the government, and being all strictly judicial, Congress cannot require or authorize the court to ex-

ercise any other jurisdiction or power, or perform any other duty." 117 U. S., 700 ; *State* v. *Cunningham*, 83 Wis., 125, 126 ; *Klein* v. *Valerius*, (Wis.) 57 N. W. Rep., 1112.

It should be remembered, however, that " errors in law," when applied to constitutional jurisdiction, has a far wider scope than when used merely in reference to the effect of particular forms of procedure. While the errors in law which comprise the field of jurisdiction include " questions of law " as distinguished from " questions of fact," yet the distinction is not limited to the one in use in connection with the procedure adopted at the first organization of the court, or the one appropriate to give effect to any particular form of procedure ; but extends to the true distinction as drawn under our system of jurisprudence, in connection with this provision of the Constitution, between facts that the trial ·court must find from the testimony, and the application of the principles of law in reaching a judgment based upon such facts. The description of jurisdiction contained in the Constitution determines only the essential characteristics of that jurisdiction, and does not deal with the procedure by means of which the jurisdiction is called into exercise, and does not involve constitutional legislation on such principles of law as are the proper subject, both by judicial and legislative action, of those modifications which inhere in the growth and development of any system of jurisprudence. These essential characteristics are : the court is one of last resort for the correction of errors, and not for the full trial of causes, either directly by means of original process, or indirectly by means of process for the removal of a cause from the jurisdiction of another court and its retrial on the evidence and complete adjudication upon the facts and law involved ; the jurisdiction for correction of errors is co-extensive with the judical power of the State in all matters wherein legal principles, that is, rules of law or principles of equity, appear to have been erroneously or mistakenly determined by a trial court.

The exercise of this jurisdiction may be modified by the forms of procedure provided by the legislature ; and the

legal principles which in their application by trial courts form the subject-matter of the jurisdiction, may be modified by the growth and development of the body of the law. To illustrate: After the adoption of the Constitution the legislature enacted a law providing a procedure for bringing before this court the question whether a new trial should be granted for a verdict against evidence. The decision of such a question involves no retrial of the case by this court, no adjudication of facts, but only the legal question whether the rules of law as determined by this court entitle the party to another trial of his cause. And this court held that the law did not call for a judgment inconsistent with its jurisdiction, but merely provided a procedure whereby the court could exercise its jurisdiction in determining whether the rules of law had been mistakenly adjudged in the trial court.

Again, the vexed question of what conclusions are conclusions of law and what are conclusions of fact, is clearly a matter within the jurisdiction of this court; and such jurisdiction can be exercised whenever the procedure is adapted to bring before the court the action of the trial court in the decision of such question. The legal principles involved in this question have heretofore been much obscured by the habit of calling every conclusion which must be left to a jury a "question of fact," and confining a "question of law" to such conclusions as the court may decide and withdraw from the consideration of the jury. It is obvious that such phraseology grew out of the exigencies of jury trials and defines the practice regulating the sometimes arbitrary division of the function of court and jury in such a trial, and does not necessarily define the distinctions between questions of fact and law when the jurisdiction described in the Constitution is considered in the light of legal principles controlling a logical and intelligent system of jurisprudence; when, therefore, a trial court errs in treating as a question of fact conclusions which the legal principles established in the growth of our jurisprudence require to be treated as a question of law, this court, when the question is properly before it, has

jurisdiction to correct such error and to determine the true conclusion of law.

In short, the essential characteristics of the jurisdiction vested in this court are described in the Constitution; but the exercise of that jurisdiction may practically be limited or extended in consequence of changes of procedure not inconsistent with such characteristics; and the legal principles which are the subject-matter of that jurisdiction are such as belong to our system of jurisprudence, with which the Constitution did not interfere, but left to its natural growth and development.

In describing the jurisdiction of this court, the Constitution sought to avoid specific and well understood evils; but the jurisdiction actually conferred is conferred broadly and must be construed, both as to its limitations and its breadth, with a view to give full effect to a law which is fundamental and not temporary, and which is dealing not with the forms of procedure or the details of particular cases, but with the essential character of a court to which is committed for an indefinite future the exclusive administration of an important part of the power vested in an independent department of government. In the nature of things, questions of doubt may from time to time arise in the administration of such a jurisdiction; there can, however, be no doubt but that the determination by this court, upon the evidence, of questions of pure fact, for the mere purpose of rendering its own judgment upon issues of fact, is inconsistent with such a jurisdiction, and clearly obnoxious to that underlying principle which holds the security of the citizen and the certainty of the law as best served by confining the supreme and uncontrolled power vested in a court of last resort for the correction of errors to the determination of principles of law.

In examining the Act of 1893 we must assume that the legislature had in mind the description of the jurisdiction of the Supreme Court of Errors contained in the Constitution, and the view of that jurisdiction which had generally prevailed and had been clearly expressed by this court in *Dud-*

*ley* v. *Deming*, and did not intend to require any action of
the court inconsistent with such jurisdiction.   It is claimed
that some provisions of the Act, especially in § 9, indicate
that the legislature did intend such a result.   But we can
impute to the legislature an intention of that nature only
under constraint of language perfectly clear, consistent with
other provisions of the Act, and insusceptible of any other
meaning.   *Gough* v. *Dorsey*, 27 Wis., 131.   The language
of § 9 is far from clear, is apparently inconsistent with other
portions of the Act, and raises doubts, at least, whether the
object imputed to it could be made effective, aside from con-
stitutional objections.   We must therefore discard the con-
struction claimed by the plaintiff, if we can give effect to
the Act by any other reasonable construction.   The sugges-
tion that the Act may be treated as providing a motion for
a new trial on the same grounds as support such a motion
when the facts are found by a jury is too inconsistent with
the express language and all the details of the Act to be en-
tertained.   But we think the Act, as a whole, fairly ex-
presses a purpose, consistent with the jurisdiction of this
court, in language not so interwoven with the uncertain and
defective language as to make it impossible to give effect to
that purpose.

   Most of the provisions of the Act relate not to jurisdiction
but to procedure, and prescribe what proceedings in the trial
courts shall be spread upon the record ; its significant and
controlling feature is that it authorizes no appeal whatever
from the judgment of the court below, nor does it attempt
to alter the legal definition of the word appeal.   In this
State "appeal" has heretofore been used by court and legis-
lature with two meanings only ; one as applicable to the
superior and inferior courts when it means the transfer of
the case to another jurisdiction for trial, and one as applica-
ble to the Supreme Court of Errors when it means an appli-
cation to this court to reverse or set aside a judgment of a
trial court for errors in law.   In the latter sense it was never
used until the Act of 1882 authorized all errors previously
corrected by means of a writ of error, a motion in error, or

a motion for a new trial, to be included in one application and called that application an appeal. The name in no way altered the nature of the application. *Morse* v. *Rankin*, 51 Conn., 326 ; *Schlesinger* v. *Chapman*, 52 Conn., 271.

Section 1 of the Act provides that " upon the trial of any civil action to the court without a jury, in which an appeal to the supreme court of errors may now be taken, each party may request the judge to incorporate in the finding such facts as he claims to be proven by the evidence ; " and § 10 says that the rights of appeal under the Act, whatever they may be, are in addition to those now provided by law. It is evident that the word " appeal " in § 1 is used with the same meaning it bears in existing statutes, and that meaning this court has decided, in the cases cited, to be a process which is a mere substitute for a writ of error, motion in error, and motion for a new trial, for the review of questions of law. This section, therefore, controls the whole Act, · whose provisions are put in force only when there is an appeal from a judgment for errors in law ; and so the Act itself makes no provision for any appeal from the judgment of the court below. This view is consistent with § 7, which provides that " either party may appeal, from any finding or refusal to find any fact, to the supreme court of errors in the manner now provided by law ; " here " appeal " is used with its common and not its legal meaning ; an appeal in the legal sense of the word from the finding or refusal to find a single fact is unknown to the law, and the only " manner now provided by law " for such " appeal " or application, is to be found in General Statutes, § 1141, which provides that if any appeal shall not present the questions of law decided by the court below, the party aggrieved may apply to the Supreme Court of Errors to rectify the same, and if upon inquiry it shall appear to the court that the appeal does not present such questions, the court shall correct it, and it shall then be proceeded with as corrected.

In 1830 the legislature first provided by statute for revising errors in law by means of a motion for a new trial ; as such motion required a statement of the facts found by the

court for the purpose of presenting the questions of law to be decided, a means was provided at the same time by way of application to the Supreme Court of Errors to correct the finding in case the action of the judge required such correction. The appeal or application first authorized by the statute of 1830, and further defined and extended by § 7, is from the action of the judge and not from the judgment of the court.

It being clear that the Act authorizes no appeal from the judgment of the trial court, that it relates to procedure and not to jurisdiction, that its provisions become operative only when an appeal is taken from the judgment of a court on account of errors in law as now provided, and that it furnishes additional facilities for the application to this court for a correction of the appeal as authorized by General Statutes, § 1141,—it is evident that one, if not the only, purpose of the Act was to modify a defect which has occasionally been felt as an evil, a defect inherent in every judicial system because the infirmities of human nature and the fallibility of human judgment cannot be eliminated.

Among the questions of law belonging to the jurisdiction of this court, and which it is important should be authoritatively determined as they arise under modified forms in changed circumstances and conditions, are, questions of legal conclusion when law and fact are so intermingled that the main fact is not a pure question of fact but a question of the legal conclusion to be drawn from subordinate facts ; and also questions whether particular subordinate facts constitute the basis for a conclusion of fact or a conclusion of law ; such questions may arise either during the course of trial, as upon findings affecting the admissibility of evidence, or may be involved in the final judgment of the trial court. The procedure by which such questions have generally been brought before us for review is a motion for a new trial now incorporated into the proceedings called appeal, in which the court below is required to find the facts sufficient to present the questions of law ; such a procedure is amply adapted for its purpose provided all practicable security is given

against mistake or error on the part of the trial judge—mistake in overlooking a material fact admittedly proved, error in misjudging the necessity of including in the finding any fact or series of subordinate facts for the purpose of presenting the question of law decided.

The Act of 1830 was passed to perfect such procedure and to provide such security against mistake or error, but it has proved inadequate; the Act of 1893 was evidently passed to provide a further and additional remedy; the remedy consists in compelling the trial court to so make up its record that this court can see upon the inspection of the record whether the trial court has included in its finding all the facts actually found by such court necessary to fully and fairly present the questions of law raised and decided; and if the finding does not so present the questions of law, to correct the finding by treating as a part of the finding those facts which the record shows have been found and should have been included. The Act thus enables this court, without any independent and preliminary inquiry as required by the Act of 1830, and without remanding the case for a fuller statement of facts found, to exercise its full jurisdiction and upon a review of the questions of law raised in connection with the facts found necessary to present those questions, to render a final judgment.

We think the Act of 1893 must be construed in accordance with this evident purpose, because the other construction claimed is inconsistent with the apparent intention of the Constitution in the establishment of this court, and because the construction given is a reasonable one and gives effect to every part of the Act as fully as can be done. The fact that a meaning and effect certain and unquestionable is not given to all the language of the Act is due to difficulties inherent in the language used. It was suggested at the bar that in accomplishing the main and legitimate purpose above set forth, this Act was framed with the idea of assimilating to some extent the practice of this State and the jurisdiction of this court to that of a State whose Constitution does not give to its people the protection of that

independent and peculiar jurisdiction vested by our own in the Supreme Court of Errors. If this is so, it is certainly not strange that such an attempt, even when intrusted to the ablest hands, to assimilate our own to the practice of another State,—a practice developed under widely different circumstances and " opposed to all the analogies of our system,"— should result in uncertain and inconsistent legislation.

We conclude that the Act of 1893 does not require this court to determine, upon evidence spread upon the record, questions of pure fact settled by the trial court, and therefore we cannot consider the plaintiff's claim that the conclusions of the court below upon the pure issues of fact are clearly against the weight of evidence.

*Second:* Does the Act of 1893 authorize this court to correct the finding of the trial court by taking into consideration such facts as the record shows to have been found by the court and to be necessary for the proper presentation of questions of law arising in the case?

This question has of necessity been substantially answered in the consideration of the first question, and it is unnecessary to repeat the reasons already given, with their qualifications. The Act so regulates the procedure in the trial courts that the parties to each case may have the record disclose the facts they deem essential to be incorporated in the finding, when a finding is necessary to present questions of law actually raised and decided, as well as the action of the court upon requests of the parties to find such facts to be proven or not proven, and the exceptions of the parties to such action ; and so extends and enlarges the operation of § 1141 of the General Statutes that the application authorized by that statute for the correction of the appeal may be contained in the appeal itself, and may be determined on argument of the appeal, upon inspection of the record, as well as upon any other " inquiry " which the provisions of § 1141 may authorize. It must be remembered, however, that while the prescription of the contents of the record is a matter of procedure, and may be wholly within the legislative discretion, yet the

mere incorporation in the record of matters not pertinent to the correction of errors in law cannot affect the judgments of this court in the exercises of its jurisdiction.

The plaintiff in this case claims that the finding of the court below does not present the question of law raised and decided, and that it should be corrected by treating as incorporated in the finding the subordinate facts found by the court, and the rules of law which the court followed in reaching its main conclusion of fact as above set forth.

The record shows that the plaintiff requested the court to incorporate these facts in its finding; the court declined to do so, not because they were not true, for the court does not state that they are not proven, but presumedly because the court did not deem them material to the presentation of any question of law.

We think they were material. The record shows that the rule of burden of proof which the court disregarded, was claimed in the presentation of the evidence, and must have been claimed in the argument, and that the question of the correctness of that rule was in fact decided by the court.

The defendant claims that the request of the plaintiff to the judge to incorporate into the finding the facts stated to be proven by the court in the opinion filed as the grounds of its judgment was informal, and that no redress can be had under such a request. There is no practice under this Act. If it remains in its present form it will be difficult for counsel to be sure what is matter of form and what of substance, unless the practice is regulated by rules of court. In these first cases we are not justified in refusing redress for any informality that does not clearly violate a substantial and essential requirement, and we cannot sustain the objection made in this case.

The defendant further claims that inasmuch as the court below declined to note upon the request of the plaintiff that the facts were proven, the facts do not appear by the record to have been found, and therefore cannot now be incorporated into the finding. The unexplained failure of the court to make any note upon the request of the plaintiff asking

the court to find as proven the particular facts which the court states in its opinion were proven and formed the grounds of its judgment, must be taken as equivalent to a formal note that such facts were proven, when upon an application to correct the finding by incorporating in it such facts, that opinion, certified by the judge, is before us and printed in the record under a rule of this court for the purpose of advising us of the judge's own statements of his official acts. We must therefore treat the finding as if a statement of the particular facts found by the court and the rule of burden of proof adopted by the court had been incorporated in the finding as requested by the plaintiff.

Did the court err in holding that the burden of proof was on the plaintiff to show that he did treat the case with ordinary skill and care, instead of holding that the burden of proof was upon the defendant to show that ordinary and reasonable skill and care were not used by the defendant?

The plaintiff's action is brought to recover the value of services rendered as a physician to the defendant at his request. The plaintiff must prove by testimony that he is a physician, that he was employed as such by the defendant, that he rendered the services alleged, and the value of such services. He is not bound to prove the value of the services to the defendant; they may save the defendant's life or they may effect no cure, or a cure may follow without aid from the services. In the first case the value of the services to the defendant can hardly be measured; in the others they are of no value. The value to be proved by the plaintiff is the ordinary and reasonable price for services of that nature ; the contract of employment, unless special conditions are made, does not include an insurance of actual benefit to the patient ; in this respect the employment of a physician differs essentially from the employment of a builder or of any person whose employment involves an insurance that the services shall answer the purposes for which they are rendered.

The obligation of a physician to exercise ordinary care and skill arises not so directly from the contract of employ-

ment as from the duty imposed upon him by law, which requires him in the exercise of a skilled and privileged profession to use at his peril that degree of skill and care which the law says shall be requisite for the practice of such profession. The violation of that duty is a wrong which entitles the person who suffers from that wrong to legal redress. This duty, and the right of action consequent on its violation, existed before the law recognized any contract of employment, and when the only compensation a physician could receive for his services was the honorarium paid at the option of the patient. There is oftentimes a narrow line of distinction between the duty thus imposed by law and an implied contract, and the distinction has been further obscured by the use of a legal fiction for the purposes of pleading, so as to enable a favorite form of action to be adopted which otherwise might be inapplicable to the case. The Practice Act, in providing a single form for every cause of action, has destroyed this legal fiction and removed the reason for the use of some loose expressions it naturally caused.

The defendant claims that the use of ordinary skill and care is not merely a duty imposed by law upon the physician, but is required by an agreement implied from the fact of the contract of employment; and that, therefore, the burden of proof is on the plaintiff to prove the use of ordinary care and skill in order to establish his case. It is unnecessary now to consider how far the theory of implied contract in such case may have been affected by the Practice Act, because in this case it does not affect the result. Whatever may be the true reason of the physician's obligation to exercise ordinary skill, the violation of that obligation to the injury of the patient is ground for an independent action, and may also be set up as a defense to the suit of the physician to recover his compensation; but such defense is essentially in the nature of a bar.

The theory of law which holds the physician to a contract to use ordinary skill implied as an incident to the contract of employment, does not make the performance of such im-

plied contract such an element of his right of action that it must be alleged in his complaint; and the burden of proof imposed upon the physician for the purpose of making out his case is fully satisfied by another theory of law which presumes from the evidence of his right to exercise his profession, that he has not violated his duty to exercise it with the requisite care and skill.

The disproof of the actual acts and omissions necessary to show that ordinary skill has not in fact been exercised in a particular case, is not a part of the physician's case in chief; unless such acts and omissions are established by a preponderance of evidence the physicians' right of action remains proved. Such acts and omissions are set up by the defendant not as disproving the allegations of the complaint, but as establishing an independent series of facts that are a bar to the right of action. The defendant thus becomes an actor, and *quo ad* the facts he has undertaken to establish, the burden of proof is on him. Whart. on Ev., § 357.

In the present case the defendant claims that the error of the court as to the burden of proof is a mere theoretical error, and could not have practically affected the result. We think it was a substantial error. The defendant not only relied in evidence upon these independent facts, but also set them up as a special defense in his answer. So far as any contradictory evidence is concerned the case turned wholly on this special defense. An inspection of the record makes it very clear that the adoption of the incorrect rule as to burden of proof may have been the effective cause of the judgment.

There is error in the judgment of the Court of Common Pleas and a new trial is ordered.

In this opinion ANDREWS, C. J., and TORRANCE, J., concurred.

FENN, J., (dissenting). I concur in the opinion of the court to the extent to which the dissenting opinion of Judge BALDWIN agrees ; that is to say, that a new trial should be grant-

ed for error in the ruling of the Court of Common Pleas with respect to the burden of proof, and that this error can be made to appear by our action in enlarging the finding of facts, by reference to the statements in the memorandum of decision.

I also think that the terms of the Act of 1893 do not require this court to determine, upon evidence spread upon the record, questions of pure fact settled by the trial court, not connected with questions of law, as to the decision of which error is assigned.

I concur with Judge BALDWIN to the extent that it was not necessary, in order to justify the decision of the case by this court, or the construction of the statute arrived at, that the inquiry and determination, in the opinion of the court, as to the constitutional limits of the jurisdiction of the Supreme Court of Errors, should have been made. I think, therefore, this part of the opinion is " but an *obiter dictum,*" which I regret that the court should have felt called upon to express, and in which for the reason stated, I feel justified in declining to participate. I desire to be understood as intimating no view whatever upon the subject, as one not properly before us ; the decision reached resting, soundly, I think, on other grounds ; which being the case I prefer not to abridge my full liberty for judicial action upon the question, if "some future statute should present it."

BALDWIN, J., (dissenting). I concur in the opinion of the court that a new trial should be granted for error in the ruling of the Court of Common Pleas with respect to the burden of proof, and that, under the Act of 1893, this error can be made to appear by our action in enlarging the finding of facts, by reference to the statements in the memorandum of decision. I also concur in the position that the terms of that Act are not such as to require this court to determine, upon evidence spread upon the record, questions of pure fact settled by the trial court, which are not connected with any questions of law, as to the decision of which error is assigned.

But I do not think it necessary to justify such a construction of the statute, that we should enter into any inquiry as to the constitutional limits of the jurisdiction of the Supreme Court of Errors ; still less that we should hold that those limits are unalterably defined by its very name, in such a manner as to exclude it from ever taking cognizance of errors of fact, except in aid of its power to remedy errors of law.

The original draft of the first section of the judiciary article of our Constitution (article V.), as reported to the Convention of 1818, read thus :—

" The Judicial power of the State shall be vested in a Supreme Court of Errors, a superior Court, and such inferior Courts as the General Assembly shall from time to time, ordain and establish. The powers and jurisdiction of which Courts shall be defined by law." Journal of the Constitution, as printed by the State, Hartford, 1873, p. 89.

The first sentence of this was manifestly taken from article III. of the U. S. Constitution, § 1, *i. e.*, " The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish."

This section of our Constitution was approved in the form reported. Journal of Convention, p. 39. The whole Constitution was afterwards referred to an engrossing committee " for the purpose of correcting verbal inaccuracies and errors in phraseology." Journal, p. 67. Upon their report, it was adopted section by section (ibid., p. 68), that in question being changed only by the substitution of a colon, for a full period, after the words " ordain and establish," so that it now appears in the following form :—

" The judicial power of the State shall be vested in a Supreme Court of Errors, a Superiour Court, and such inferiour courts as the General Assembly shall, from time to time, ordain and establish : the powers and jurisdiction of which courts shall be defined by law."

Undoubtedly this provision requires that there shall always be in this State two courts, one known as a Supreme

Court of Errors, and one as a Superior Court. Undoubted-
ly, also, the Supreme Court of Errors must always be the
court of last resort for the correction of the errors of infe-
rior judicial tribunals, and the Superior Court must be a
court of superior jurisdiction to such inferior courts as may,
from time to time, be established. But the words used do
not seem to me necessarily to confine the Supreme Court of
Errors to the business of passing upon errors of law only;
nor to invest the Superior Court with "a supreme jurisdic-
tion, original and appellate, over the trial of all causes not
committed to the jurisdiction of inferior courts." Such a
meaning can only be read into them, by assuming that, in
giving to these courts the names of courts then existing, it
was meant to give them also substantially the same juris-
diction. This seems to me to be pressing the historical ar-
gument too far.

The Supreme Court of Errors had then only existed for
thirty-four years. It was not much more venerable for an-
tiquity than the Court of Common Pleas is now. Its judges
were not to continue in office beyond June 1st, 1819. They
consisted of the nine judges of the Superior Court. The
Supreme Court of Errors had jurisdiction to review no judg-
ments except those of the Superior Court. Statutes, Ed. 1808,
p. 219.

The Superior Court had exclusive "jurisdiction of all
writs of error, brought for reversal of any judgment of the
county court, or any inferior court; or of an assistant or jus-
tice of the peace, in civil or criminal causes." Statutes,
Ed. 1808, p. 260. It had had this jurisdiction from early
Colonial times. Ibid., p. 260, note 1. Such writs of error
lay both for errors in law and errors in fact. 1 Swift's Dig.,
(side page) 790.

It had also a large original jurisdiction over questions of
fact; trying cases with or without a jury. Appeals lay to
it from judgments of City Courts for a re-trial of questions
of fact, as well as writs of error, assigning errors in law;
Statutes, Ed. 1808, p. 127.

Each Superior Court was to be held by three judges. Ap-

peals lay to it from judgments of the county courts in law actions, for a re-trial of matters of fact, except in matters (not affecting title to land) involving not over $70, or bonds or notes vouched by two witnesses. Statutes, Ed. 1808, p. 37. No appeal ordinarily lay to it in equity cases. Id., p. 225, § 1.

Immediately after the adoption of the Constitution, the General Assembly passed an " Act constituting and regulating Courts." Statute Laws, Book II., 1819; Acts of 1818, p. 311. This provides that after June 1st, 1819, the Superior Court should consist of one chief judge and four assistant judges, to be appointed for that purpose, and that they " shall constitute the Supreme Court of Errors, and shall have and possess, all the powers and authorities now by law vested in the Supreme Court of Errors." It further provided that the Superior Court should be thereafter held by one judge.

This Act of 1818 established the two courts specially called for by the Constitution of 1818.

The Constitution did not execute itself. It was for the legislature to constitute each court and define its powers and jurisdiction; and by this Act, it was done. If the ordinary rules of grammar are to be respected, the last clause in § 1 of article V. both as originally punctuated, and as finally engrossed and adopted, qualifies each member of the preceding clause. Its construction must be the same as if it read thus : " The judicial power of the State shall be vested in a Supreme Court of Errors, the powers and jurisdiction of which shall be defined by law ; a Superior Court, the powers and jurisdiction of which shall be defined by law ; and such inferior courts as the General Assembly shall, from time to time, ordain and establish, the powers and jurisdiction of which shall be defined by law."

And so, it seems to me, the General Assembly of 1818 understood it and executed it. The constitution of each of the two courts named was made quite different from that of the court of the same name previously existing. The judges of each were to be still the same, but their number was reduced from nine to five, and in place of the three

judges who theretofore sat at each term of the Superior Court, it was henceforth to be held by one, alone.

The jurisdiction of each court was defined and made the same that it had been; but the power that made it the same might, at its discretion, have made it different, save only so far as the constitutional name of each court established its character.

Subsequent legislation has radically changed the jurisdiction of the Superior Court. It has abolished the right of re-trial there, on appeal, of cases once tried in inferior courts. It has abolished most of its jurisdiction by proceedings in error, to review the judgments of inferior courts. It has taken away a large part of its original civil and criminal jurisdiction, in favor of the Courts of Common Pleas and City Courts, some of the latter of which have jurisdiction over cases involving any amount in value, where the parties reside in the city.

In respect to the Supreme Court of Errors, the ancient statute which was relied on in *Dudley* v. *Deming*, restricting its jurisdiction to writs of error or analogous proceedings for errors in law, has been replaced by General Statutes, § 815, which is broad enough to include any errors of fact. The court has repeatedly taken cognizance of writs of error for an error of fact, similar to a writ of error *coram nobis* at common law. *Burgess* v. *Tweedy*, 16 Conn., 39, 43; *Nugent* v. *Wrinn*, 44 Conn., 273.

The legislature gave this court, for the first time, in 1821, the power to grant (not, as before, to advise) new trials for verdicts against evidence. The disposition of such motions is, in substance, a re-trial of questions of pure fact. The common law gave the power to set aside such verdicts to the trial court, upon its own minutes or recollection of the evidence. Our statute of 1821 gave it to the Supreme Court of Errors, on a finding by the trial court, in which the evidence was stated; and gave it as a discretionary power. Statutes, Ed. 1821, p. 54, § 68. How does this differ in principle from a jurisdiction to review findings of a trial judge because clearly against the weight of evidence? Each

finding, that of the jury, and that of the court sitting without a jury, is a step in a judicial proceeding, and errors in either seem therefore to me to be a proper subject of correction by the supreme judicial power of the State, if the legislature so wills. Neither, however, in strictness, presents any question of law. *Fuller* v. *Bailey*, 58 N. H., 71 ; *Little* v. *Upham*, 64 N. H., 279, 6 Atlantic Rep., 220 ; *Young* v. *Davis*, 30 N. Y., 134. If this court can grant new trials in the Superior Court, because a jury of twelve men came to wrong conclusions of fact, I believe the legislature could also authorize it to grant new trials there, because one man, the judge, sitting instead of a jury, came to wrong conclusions of fact.

It is asserted in the opinion of the court that the creation of a Supreme Court of Errors in 1784 " was the deliberate adoption into our system of judicature of the fundamental principle, which has ever since characterized it, that the certainty of our jurisprudence as well as the security of parties litigant depends upon confining the jurisdiction of a court of last resort to the settlement of rules of law ; " or, as it is elsewhere phrased, " the underlying principle involved was that the administration of justice is not safe when the court of last resort for the settlement of the law, in the exercise of an absolute and final power, can render judgment on facts and law so intermingled that its decision is not simply the declaration of the law but may become the arbitration of the case." This principle, it is affirmed, was incorporated in our Constitution by force of the name given to this court, because it " expressed the conviction of the people that a jurisdiction of mixed law and fact vested in any court of last resort, exercising a supreme and uncontrolled power, was inconsistent with a sound system of jurisprudence and was dangerous to the administration of justice." But the framers of our Constitution were familiar with the practice of English chancery, as well as with that in the courts of the United States. A party aggrieved by a decree of the Lord Chancellor could always appeal, and have his case reheard on the same evidence in the House of

Lords.   2 Madd. Ch., 435.   In chancery only were the facts
determined by the court, and while England was content to
make the verdict of a jury final, in ordinary cases, it refused
from the first to accord similar respect to the findings of any
single judge.   The Judiciary Act of the United States, adopt-
ed by Congress in 1789, and which was largely the work of
one of the greatest lawyers and judges of Connecticut, Oli-
ver Ellsworth, followed in the same lines, by restricting the
appellate jurisdiction of the Supreme Court, in actions at
law, to the remedy by writ of error, while giving a general
appeal from final decrees in equity or admiralty.   In 1796,
Ellsworth, as Chief Justice of the Supreme Court of the
United States, referred to this distinction as to the right of
review, in these words : " An appeal is a process of civil law
origin, and removes a cause entirely : subjecting the fact as
well as the law, to a review and re-trial : but a writ of error
is a process of common law origin, and it removes nothing
for re-examination but the law."   *Wiscart* v. *Dauchy*, 3 Dal-
las, 327.

Pierpont Edwards, the chairman of the committee appoint-
ed by the Convention of 1818 to report a draft of a Consti-
tution, and who, as such, reported this article as to the
judiciary, was, at the time, the judge of the District Court
of the United States for this district.   Stephen Mix Mitch-
ell, William Bristol, Nathan Smith, Alexander Wolcott, (who
had been nominated by President Madison, a few years be-
fore, as an associate justice of the Supreme Court of the
United States,) William Hungerford, John S. Peters, and
others familiar with the practice in the Federal courts, were
members of the convention.   Then, as now, this mode of re-
hearing equity causes in those courts, on appeal, upon both
fact and law, was familiar and acceptable to the bar.   It was
seldom that the appellate court differed from the trial court
in its conclusions of fact, and only when they were deemed
to be clearly against the weight of evidence.   For over a
century the Supreme Court of the United States has exer-
cised this " jurisdiction of mixed law and fact," in a large
and important class of causes, with " supreme and uncon-

trolled power," and Congress has recently given similar powers to the Circuit Courts of Appeals. I cannot believe that the Convention of 1818 was convinced that the existence of such a jurisdiction " was inconsistent with a sound system of jurisprudence, and was dangerous to the administration of justice."

Similar legislation to that of the United States has been had (following the English chancery practice) in many of our States, and has occasioned no inconvenience which has not been thought to be outweighed by the advantages gained. *Reed* v. *Reed*, 114 Mass., 372; *Baird* v. *Mayor*, 96 N. Y., 567; *Worrall's Appeal*, 110 Pa. State, 349, 1 Atlantic Rep., 380; *Deacon* v. *Van Nuys*, 129 Ind., 580, 28 Northeastern Rep., 865; *Baker* v. *Rockabrand*, 118 Ills., 365, 8 Northeastern Rep., 456; Code of Iowa, § 2472; see also Public Statutes of R. I., Rev. of 1882, p. 526, § 8.

The opinion of the court declares that " the Supreme Court of Errors is not a supreme court for all purposes, but a supreme court only for the correction of errors in law; if its jurisdiction also included the determination of facts, it would then be supreme for all purposes, and its name a misnomer." This seems to me to confuse a jurisdiction for the determination of facts with a jurisdiction for the determination of errors of fact. If a trial court comes to erroneous conclusions of fact, the revision of its action, by correcting the errors in its conclusions, is a determination of the facts, only as a mode of the redress of errors. In many cases, indeed, a finding of fact may be, of itself, an error of law. It is so when it is made without any evidence of the fact, as to matters not the subject of judicial notice. *The E. A. Packer*, 140 U. S., 360; *Mason* v. *Lord*, 40 N. Y., 476. And to refuse to find a material fact which was in issue and was proved by uncontradicted evidence, is also an error of law. *U. S.* v. *Adams*, 9 Wall., 661; *Commercial Union Assurance Co.* v. *Scammon*, 126 Ills., 355, 18 Northeastern Rep., 562; *Whitman* v. *Winchester Repeating Arms Co.*, 55 Conn., 247; *Kennedy* v. *Porter*, 109 N. Y., 526, 17 Northeastern Rep., 426

*Bedlow* v. *N. Y. Floating Dry Dock Co.*, 112 N. Y., 263, 19 Northeastern Rep., 800 ; *Fernald* v. *Bush*, 131 Mass., 591.

The word " errors " certainly includes such errors of fact as were, at common law, grounds for a writ of error *coram nobis*. It seems to me a sticking in the bark to say that it can include no others. In the Dartmouth College case, a similar claim was pressed. There were, it was argued, few corporations in existence when the Constitution of the United States was adopted, and the theory that the charter of a corporation was a contract with the State was unknown. But, Chief Justice MARSHALL replied, " it is not enough to say, that this particular case was not in the mind of the convention, when the article was framed, nor of the American people, when it was adopted. It is necessary to go farther, and to say that, had this particular case been suggested, the language would have been so varied, as to exclude it, or it would have been made a special exception. The case being within the words of the rule, must be within its operation likewise, unless there be something in the literal construction so obviously absurd, or mischievous, or repugnant to the general spirit of the instrument, as to justify those who expound the constitution in making it an exception." *Dartmouth College* v. *Woodward*, 4 Wheat., 518.

The Act of 1893, it is decided in this case, is an enlargement of the jurisdiction of this court, by which it can now, to a greater extent or with more facility than formerly, redress errors in the finding of a trial court, as to conclusions of fact. Whether the General Assembly can hereafter, should it deem proper, extend our powers in this direction still farther, is a question which, it seems to me, is beyond the issues now presented for our determination. It is one that may never arise; but, if some future statute should present it, the rule of construction announced in the opinion of the court, although, if I am right in my view of this case, it is but an *obiter dictum*, would certainly be appealed to as an authority by those who might then contend that the legislature had transcended its powers. It is for this reason that I have expressed at length the grounds of my dissent from it.