*In the Matter of the Disbarment of* CLEO D. BURNETTE.

No. 14,589.    (85 Pac. 575.)

SYLLABUS BY THE COURT.

<table>
<tr><td>73</td><td>609</td></tr>
<tr><td>73</td><td>753</td></tr>
<tr><td>73</td><td>792</td></tr>
<tr><td>74</td><td>687</td></tr>
</table>

<table>
<tr><td>73</td><td>609</td></tr>
<tr><td>f76</td><td>195</td></tr>
</table>

<table>
<tr><td>73</td><td>609</td></tr>
<tr><td>f78</td><td>155</td></tr>
<tr><td>78</td><td>744</td></tr>
</table>

1. ATTORNEYS — *Disbarment* — *Character of the Proceeding.* Under the statutes of this state the remedy of disbarment is a special proceeding to deprive the accused of the power to abuse the office of attorney and counselor at law. It is not a criminal proceeding, but its gravity suggests caution and strictness. The special statute regulating it must be followed so far as the steps to be taken are prescribed. Otherwise it is to be conducted in general harmony with the practice of the courts in civil cases.

2. SUPREME COURT—*Original Jurisdiction.* Under the constitution of this state the original jurisdiction of the supreme court is confined to proceedings in *quo warranto,* mandamus, and *habeas corpus;* and even in these matters some special reason must exist for invoking its powers or parties will be relegated to courts of general jurisdiction for relief.

3. —————— *Appellate Jurisdiction.* Under the constitution of this state the appellate jurisdiction of the supreme court is limited to expounding the law and correcting errors appearing on the record in the proceedings of inferior courts, whether such proceedings be presented for review by proceedings in error or by appeal.

4. —————— *Legislature Cannot Enlarge Scope of Original Jurisdiction.* It is beyond the power of the legislature to enlarge the scope of the original jurisdiction of this court, either

39—73 KAN.

directly by authorizing the primary consideration of cases other than those specified in the constitution, or indirectly by including such cases within its review power on appeal.

5. JURISDICTION—*Trial de Novo on Appeal.* The jurisdiction to consider causes *de novo* on appeal, and to decide them on the law and the evidence according to the right of the case, independent of the rulings and judgment of the lower court, is original and not appellate.

6. STATUTORY CONSTRUCTION — *Constitutionality.* If a statute be open to two interpretations, under one of which it would be constitutional and under the other unconstitutional, the court will adopt the meaning consonant with validity.

7. ATTORNEYS — *Disbarment — Appellate Procedure — Statute Construed.* The statute relating to appeals in disbarment cases (Gen. Stat. 1901, § 403) which provides that all the original papers together with a transcript of the docket entries shall be transferred to this court, to be finally considered and acted upon, being ambiguous, is held not to authorize a trial *de novo* but to create a special method for bringing such causes to this court for consideration according to its constitutional appellate jurisdiction.

8. ——— *Cause Remanded for Trial—Refiling of Accusation.* After a judgment of this court in a disbarment appeal remanding the cause to the district court for trial, it is not essential to jurisdiction that the accusation be refiled in the district court.

9. ——— *Omission Specifically to Order Accusation Transferred — Jurisdiction.* In such a case the omission of this court to make a specific order relating to the transfer of the accusation to the district court and its custody pending the proceedings there does not deprive the district court of jurisdiction, and if the accusation actually be present there, and accessible to the court and to the accused during the trial, he sustains no injury of which he can complain.

10. EVIDENCE — *Attorney and Client — Privileged Communication—Publication.* After a party to a cause has voluntarily solicited and procured the reading of his unfiled pleading by a non-professional stranger, has published its contents in a newspaper interview, and has spread the substance of it upon the record of a court of general jurisdiction in a pleading filed against the attorney who assisted in preparing it, the privileged character of the document is waived; it then becomes common public property; the attorney is released from the confidential relation he bore to it before its publi-

*In re* Burnette.

cation, and his production of a copy of it for use as evidence in a subsequent proceeding brought against the party is not a breach of privilege.

11. —— *Disbarment Proceeding — Failure of Accused to Testify.* The failure of the accused in a disbarment proceeding to give testimony either in denial or explanation of incriminating facts may be considered by the court in weighing the evidence of his guilt.

Appeal from Sumner district court; PRESTON B. GILLETT, judge *pro tem.* Opinion filed May 12, 1906. Affirmed.

*Hackney & Lafferty, James Lawrence,* and *Waggener, Doster & Orr,* for the accused.

*J. A. Burnette, W. W. Schwinn,* and *J. S. Dey,* prosecuting committee.

The opinion of the court was delivered by

BURCH, J.: On September 2, 1903, the district court of Sumner county rendered a judgment revoking the license of Cleo D. Burnette to practice as an attorney and counselor at law. From that judgment an appeal was taken to this court, under the provisions of section 403 of the General Statutes of 1901, which reads as follows:

"In case of a removal or suspension being ordered by a district court, an appeal therefrom lies to the supreme court, and all the original papers, together with a transcript of the docket entries, shall thereupon be transferred to the supreme court, to be there considered and finally acted upon. A judgment of acquittal in the district court is final."

When the appeal was heard it was argued that the judgment was erroneous because the accusation had been verified upon information and belief only, and because, after appellant had failed to answer, the court, acting under section 402 of the General Statutes of 1901, rendered such judgment as the case required without hearing evidence. Upon consultation, it was

understood that a majority of the court believed that
the judgment should be reversed because it had been
rendered without evidence in support of the accusa-
tion.   A minority also thought the accusation to be
insufficiently verified.   Therefore an order was made
remanding the cause to the district court, with in-
structions to set aside its judgment and to proceed
with a hearing upon the accusation.   Various mem-
bers of the court expressed their views, from which
it appears that, while the order of reversal was agreed
to by a majority, neither ground of reversal was sus-
tained, and the judgment of the district court should
have been affirmed.   (*In re Burnette,* 70 Kan. 229, 78
Pac. 440.)   This fact was not noted until the order of
reversal had gone into effect.

Upon the return of the cause to the district court a
trial was had, and a judgment of disbarment was again
entered, from which the present appeal was taken.
The accused now claims this court had no power to
remand the cause; that the appeal is for the purpose
of a hearing *de novo;* that the object of filing all origi-
nal papers and a transcript of the docket entries in
this court is that a trial *de novo* may be had; that when
the original papers are transferred to this court they
are to be considered independently of the judgment of
the district court, and that a final judgment must be
rendered upon them here.

In this state remedies in courts of justice are divided
into two classes—actions and special proceedings.   An
action is an ordinary proceeding by which a party
prosecutes another for the enforcement or protection
of a right, the redress or prevention of a wrong, or
the punishment of a public offense.   There are two
kinds of actions—civil and criminal.   A criminal ac-
tion is one prosecuted by the state as a party against a
person charged with a public offense, for the punish-
ment thereof.   Every other action is a civil action.
Every remedy other than an action is a special pro-
ceeding.   (Gen. Stat. 1901, §§ 4431–4436.)

A disbarment proceeding is not prosecuted by the state as a party. Many causes for disbarment are not denounced as crimes at all. Acts amounting to offenses under the crimes act which constitute causes for disbarment are such only because they disclose a disqualification to exercise the rights, privileges and powers of an attorney and counselor at law. Proceedings to disbar an attorney on account of criminal conduct connected with the practice of his profession are wholly independent of any prosecution for crime. The proceeding to disbar is not for the punishment of the derelict attorney, but for the protection of the courts, the legal profession, and the administration of justice generally. The purpose is not to enforce a forfeiture against the accused in the sense of an amercement, or to visit any kind of retribution upon him, but to deprive him of the power and opportunity to abuse an office. In all free governments crimes must be defined by the legislative power so that nothing is left to the courts but to interpret and administer its will. But every court has the right to purge its roll of persons guilty of misconduct, whether the acts done have been proscribed in advance or not.

It is true, as stated in *Peyton's Appeal,* 12 Kan. 398, that the public is benefited by the disbarment of a disreputable lawyer, that it involves him in disgrace, and that it takes away from him the means of gaining a livelihood. The gravity of the matter suggests caution and strictness. But it contravenes the express classification of the statute, is destructive of scientific accuracy, and leads to confusion, to call the proceeding criminal. This confusion is nowise clarified by using the hybrid expression "*quasi*-criminal." It involves an ancient fallacy to give a thing a name and then attempt to prove its attributes by that name. The learned judge who presided at the last trial was no doubt misled by the sometime description of the proceeding as criminal. He excluded important deposi-

tions taken against the appellant, holding that the accused had the right to meet the witnesses face to face. Such is not the law (4 Cyc. 915), and the circumstance illustrates the great danger lurking in the unnecessary employment of unauthorized terms. It is sufficient to say with the legislature that the remedy of disbarment is a special proceeding. The special statute regulating the matter must be observed so far as the steps to be taken have been prescribed. Otherwise the proceeding must be conducted in general harmony with the practice of the courts in civil matters. Thus, notwithstanding the statute requires the evidence to be reduced to writing, filed and preserved, and all original papers, together with a transcript of the docket entries, to be filed in this court upon appeal, testimony not incorporated in a bill of exceptions or case-made allowed and settled by the judge will not be considered here. (*In re Norris,* 60 Kan. 649, 57 Pac. 528.)

In this state, except in certain specified matters, the supreme court is a court of error and review. In criminal cases it may reverse, affirm or modify the judgment appealed from, or may order a new trial. In civil cases it may affirm, reverse, vacate, or modify, grant new trials, and, if the facts be found or agreed to, may designate the character of judgment to be entered. But in all appellate cases the supreme court considers the conduct of the lower court. Error must be assigned as inhering in the rulings, orders and judgments appealed from. The supreme court decides the questions thus presented as they arise upon the record, and issues its mandate to the tribunal from which the appeal was taken to carry the judgment rendered into execution. Such being the general character of appellate procedure in this state, a trial *de novo* here would be an anomaly, and can take place only under the compulsion of some sovereign command. Elsewhere it is held that trials *de novo* can be had in appellate courts only by virtue of express authority, and

*In re* Burnette.

statutes to that effect are to be strictly construed. (3 Cyc. 260.)

It is doubtful if the disbarment statute of this state is of the peremptory kind required. The use of the word "appeal" does not alone import a trial *de novo*. The old civil-law signification no longer obtains, and the term not merely includes but is commonly used to designate a review of the proceedings of an inferior court brought up as by writ of error. (*Styles v. Tyler*, 64 Conn. 432, 458, 30 Atl. 165; *Dutcher v. Culver*, 23 Minn. 415, 420; *Lyles v. Barnes*, 40 Miss. 608, opinion; *The State of Florida, ex rel., v. King*, 20 Fla. 399; *In re Jessup*, 81 Cal. 408, 465, 21 Pac. 976, 22 Pac. 742, 1028, 6 L. R. A. 594.) That the appellate jurisdiction of this court under the constitution includes proceedings in error no one will deny. The limitation of final consideration and action to original papers (which do not include evidence; *In re Norris*, 60 Kan. 649, 57 Pac. 528), and a transcript of the docket entries, might be taken to indicate that the facts are not to be reinvestigated at all rather than that they shall be tried anew; and the entire statute lacks the certainty and the mandatory quality necessary to engraft this alien practice upon our appellate procedure.

Appellant cites the case of *State v. Mosher*, 128 Iowa, 82, 103 N. W. 105, in support of his contention. The Iowa statute relating to appeals in disbarment cases reads like our own, and in the opinion it was said that under the section relating to the revocation of the license of an attorney, and providing that all the original papers, with a transcript of the record, shall be transferred to the supreme court on appeal, to be there considered, the supreme court is to consider the case *de novo*. Contrary to the law of Kansas, the practice of trying certain cases *de novo* in the supreme court is an established feature of the judicial system of Iowa. In the opinion cited the question at issue is not discussed at all, and the decision was rested upon the case

of *In re Crum,* 7 N. Dak. 316, 75 N. W. 257, which was disposed of under a statute obliging the supreme court to try and determine disbarment appeals as the law and the evidence might warrant. Therefore *State v. Mosher* is not of controlling authority. The statute under consideration being ambiguous, it must be interpreted in a manner to uphold it if possible. If it were given the meaning recognized by the Iowa court it would be unconstitutional, and therefore void.

The jurisdiction to consider and decide causes *de novo* is in its essence original. The manner in which a case reaches the higher court is not the test. Jurisdiction being the power to hear and determine, the nature of the functions to be exercised controls, whether they are brought into activity by primary process or by removal from an inferior tribunal. Upon a trial *de novo* the power of an appellate court in dealing with the pleadings and the evidence, in the application of the law, and in the rendition of judgment according to the right of the case, all independent of the action of the lower court, is no different from what it would be if the case were begun there originally, and hence is not appellate within the meaning of laws creating jurisdiction. (*Lacy v. Williams,* 27 Mo. 280; *County of St. Louis v. Sparks,* 11 Mo. 201; *Ex Parte Henderson,* 6 Fla. 279; *The State, ex rel., v. Vann,* 19 Fla. 29.)

The constitution of this state provides:

"The judicial power of this state shall be vested in a supreme court, district courts, probate courts, justices of the peace, and such other courts, inferior to the supreme court, as may be provided by law. . . .

"The supreme court shall have original jurisdiction in proceedings in *quo warranto,* mandamus, and *habeas corpus;* and such appellate jurisdiction as may be provided by law." (Const. art. 3, §§ 1, 3; Gen. Stat. 1901, §§ 148, 150.)

The distinction between original and appellate jurisdiction is here clearly drawn. The supreme court, as

*In re* Burnette.

the head of the judicial system, was not made the forum for general litigation. The protection and enforcement of rights, the prevention and redress of injuries and the punishment of crimes are committed to district and inferior courts of general jurisdiction, where all ordinary actions are to be initiated and determined. A few matters of great public importance and certain depredations upon personal liberty are cognizable in the first instance by the supreme court, through proceedings in *quo warranto,* mandamus, and *habeas corpus.* But even in such cases some special reason must exist for invoking its powers or parties will be relegated to a court of general jurisdiction for relief. (*The State, ex rel., v. Breese,* 15 Kan. 123; *Evans v. Thomas,* 32 Kan. 469, 476, 4 Pac. 833; *Supreme Lodge v. Carey,* 57 Kan. 655, 47 Pac. 621; *The People v. City of Chicago,* 193 Ill. 507, 62 N. E. 179, 58 L. R. A. 833; *The People v. Board of Trade,* 193 Ill. 577, 62 N. E. 196; and cases cited in these opinions.)

It would be entirely impossible for a single supreme court to hear and decide controversies generally, arising within the state, upon their merits; and if any considerable number of them were to be heard anew little opportunity would remain for the performance of the true functions of an appellate court. Therefore the constitution establishes a classification of its own, and in all except the extraordinary matters referred to the power of the supreme court is limited to expounding the law and supervising the conduct of inferior tribunals by correcting errors in the decisions which they may promulgate.

It is beyond the power of the legislature to enlarge the scope of the original jurisdiction to which this court is confined, either directly by authorizing the primary consideration of causes other than those specified in the constitution, or indirectly by including such cases within its review power on appeal.

"This court is created by the constitution, and the outlines of its jurisdiction established by that instru-

ment. It has original jurisdiction in three specific classes of cases, which it possesses independent of any legislation, and such appellate jurisdiction as may be provided by law. The jurisdiction of the court under this last provision is wholly dependent upon the will of the legislature. It may be enlarged or restricted, as the legislature shall prescribe; but in all its acts the legislature is still under the restriction that the jurisdiction conferred must be appellate, not original." (*Auditor of State v. A. T. & S. F. Railroad Co.*, 6 Kan. 500, 504, 7 Am. Rep. 575. See, also, *The State, ex rel., v. Wilson*, 30 Kan. 661, 2 Pac. 828.)

In the case of *Klein v. Valerius and another*, 87 Wis. 54, 57 N. W. 1112, 22 L. R. A. 609, it was held that since the jurisdiction of the supreme court of Wisconsin under the constitution of that state was appellate only, except in specified cases, a statute attempting to make it the duty of the court to examine and review the evidence preserved by a bill of exceptions, and give judgment according to the right of the case, regardless of the decision by the court below upon questions of fact as well as of law, was unconstitutional and void. The opinion reads:

"It is suggested, however, that the recent amendment to section 3070, Revised Statutes, by section 2, chapter 242, Laws of 1893, makes it the 'duty' of this court to review 'all questions of law or fact presented by the record upon such appeal or writ of error,' and 'to examine and review the evidence when the same is preserved by a bill of exceptions, *and give judgment according to the right of the cause, regardless of the decision upon questions of fact or law made by the court below,* according to law and equity.' . . . Undoubtedly, within certain limits, the legislature has power to regulate the practice of this court; but it must be remembered that this court, as well as the legislature, gets its judicial power and jurisdiction directly from the constitution. That instrument declares that 'the judicial power of this state, both as to matters of law and equity, shall be vested in a supreme court, circuit courts, courts of probate, and in justices of the peace.' (Sec. 2, art. 7.) It moreover declares that 'the supreme court, except in cases otherwise pro-

vided *in this constitution,* shall have *appellate jurisdiction only,* which shall be coextensive with the state; but in no case removed to the supreme court shall a trial by jury be allowed.' (Sec. 3, art. 7.) The case at bar is not one of those otherwise provided for in the constitution, and hence is not within the exception mentioned. . . . It may be added that much less can the legislature take anything from the original jurisdiction of the circuit courts and give the same to this court in cases in which it has only appellate jurisdiction. We must hold that, in so far as section 2, chapter 242, Laws of 1893, has attempted to give this court original jurisdiction in cases in which, under the constitution, it only has appellate jurisdiction, the same is null and void." (Pages 59, 60, 62.)

. In Florida the constitution conferred jurisdiction in civil actions at law upon justices of the peace, if the amount or value involved should not exceed $100. It also gave the circuit court original jurisdiction if the amount or value in controversy should exceed $100, and final appellate jurisdiction in cases coming from justices' courts in which the amount or value should be twenty-five dollars or upward. The legislature passed an act providing that when an appeal should be perfected the justice should transmit to the clerk of the circuit court a certified copy of all the entries in his docket and all papers filed in the case, and providing that "thereupon the said appellate court shall proceed to hear the said cause, and may allow such amendments therein as may be just, and render such judgment as may be conformable to law and the justice of the case. The trial shall be by jury, if demanded by either party." A subsequent statute provided that "all appeals taken from a judgment of any justice of the peace shall be tried *de novo.*" The supreme court held these acts to be unconstitutional, as attempting to confer original jurisdiction on the circuit court, saving them, however, to the extent that they provided a method of bringing up cases for review on error ac-

cording to the proper appellate jurisdiction of the circuit court. In the opinion it was said:

" 'Appellate pertains to the judicial review. of adjudications. Appellate jurisdiction is the power to take cognizance of and review proceedings had in an inferior court, irrespective of the manner in which they are brought up, whether by appeal, or by writ of error.' . . . The case of *Ex parte Henderson,* in 6 Fla. 279, decided that the trial *de novo* of a cause coming to the circuit court on appeal from a justice's court was the exercise of original rather than appellate jurisdiction. . . . Where words confer only appellate jurisdiction, original is clearly not given. (*Ex parte Henderson.*) And especially where the constitution draws the line distinctly, and clearly declares where the boundary is, it is beyond the power of the legislature to establish a different one.

"The constitution confers on circuit courts appellate jurisdiction, and it is confined to the limits there defined. Whether exercised by a writ of error, *certiorari,* or appeal, as may be provided by statute, it is still appellate, and its office is to review the proceedings of the inferior tribunal and to decide the law of the case as presented by the record legitimately brought up by the appeal.

"The constitution conferring on parties the right of appeal, and on the circuit courts the power to entertain it, the statute has provided *how* an appeal may be taken. While it is evident that the legislature had in view a trial by the exercise of original jurisdiction of the cause appealed, yet so far as it provided the machinery by which the appeal might be effected the law is valid to give the circuit court power to dispose of the case; while so much of the law as provided for a trial by a jury, or otherwise than by a review, is not authorized but conflicts with the constitutional restriction. The appeal here provided operates as a statutory writ of error, bringing up the proceedings for examination and judgment upon their validity. *Hendricks v. Johnson,* 6 Porter, 472; *Lewis v. Nuckolls,* 26 Mo. 278; *Lyles v. Barnes,* 40 Miss. 608." (*The State, ex rel., v. Baker,* 19 Fla. 19, 26.)

The constitution of the state of Connecticut provides as follows:

"The judicial power of the state shall be vested in

a supreme court of errors, a superior court, and such inferior courts as the general assembly shall, from time to time, ordain and establish; the powers and jurisdiction of which courts shall be defined by law." (Art. 5, § 1.)

In 1893 the legislature of that state passed an act in the following terms:

"SEC. 7. Either party may appeal, from any finding or refusal to find any fact, to the supreme court of errors in the manner now by law provided."

"SEC. 9. The supreme court shall review all questions of fact raised by the appeal as well as all questions of law, and in all cases where no evidence has been improperly admitted or excluded in the trial court shall determine the questions of fact and law and render final judgment thereon. In passing upon said questions of fact said supreme court shall not reverse the finding of the trial court upon any question of fact, unless it find the conclusions of such trial court upon such question clearly against the weight of evidence.

"SEC. 10. The rights of appeal under this act shall be in addition to those now provided by law, and the provisions of this act shall apply to all suits now pending." (Pub. Acts Conn. 1893, ch. 174.)

From the use of the name "supreme court of errors," and from a consideration of the history of the judicial establishments of the state prior to the adoption of the constitution, in 1818, the court, in *Styles v. Tyler,* 64 Conn. 432, 30 Atl. 165, came to the following conclusions respecting its powers:

"The most significant feature in the establishment of the court is found in the fact that it was the deliberate adoption into our system of judicature of the fundamental principle, which has ever since characterized it, that the certainty of our jurisprudence as well as the security of parties litigant depends upon confining the jurisdiction of a court of last resort to the settlement of rules of law. . . . Two courts are established and the character of their jurisdiction described by the constitution itself; one with a supreme jurisdiction in the trial of causes, and one with a supreme and final jurisdiction in determining in the last resort the principles of law involved in the trial of causes.

The 'superior court' is a 'superior court of judicature over this state,' with a supreme jurisdiction original and appellate over the trial of all causes not committed to the jurisdiction of inferior courts. The 'supreme court of errors' is not a supreme court for all purposes, but a supreme court only for the correction of errors in law. . . . The judicial power committed to the court was intended to secure the people against a mixed jurisdiction they deemed unwise and unsafe." (Pages 447, 450, 453.)

Consequently it was held that the act quoted did not authorize the court to determine, from evidence spread upon the record brought up by appeal, questions of pure fact settled by the trial court. The syllabus of the case reads:

"The supreme court of errors, as established by the constitution of this state, is a court of last resort for the correction of errors, and its jurisdiction as described in the constitution relates to the determination of principles of law and not to the trial or retrial of pure questions of fact.

"In view of such jurisdiction, chapter 174 of the Public Acts of 1893 cannot be construed as requiring this court to determine, upon evidence spread upon the record, questions of pure fact settled by the judgment of the trial court." (*Styles v. Tyler,* 64 Conn. 432, 30 Atl. 165.)

In the case of *Jasper v. Hazen,* 4 N. Dak. 1, 58 N. W. 454, 23 L. R. A. 58, it was said:

"Under section 25, chapter 120, Laws of 1891, this court is required, upon appeal, to review questions of fact in cases tried by the court or referee, when exceptions to the findings are duly taken and returned. But this court will not try the case *de novo.* The findings below are presumed to be correct. Appellant must show error, and a finding based upon parol evidence will not be disturbed unless the error be made clearly to appear." (Syllabus.)

This doctrine is approved. The less-pronounced views announced in the case of *Christianson v. Warehouse Association,* 5 N. Dak. 438, 67 N. W. 300, 32 L. R. A. 730, are not in harmony with the principles

which lie at the foundation of the judicial system of this state. The decisions quoted are entirely sound, and are conclusive against the appellant's contention.

In the case of *Marbury v. Madison,* 5 U. S. 137 (reprint, vols. 5-6, p. 49), 2 L. Ed. 60, involving the power of congress to authorize the supreme court of the United States to issue the writ of mandamus, Chief Justice Marshall said:

"The act to establish the judicial courts of the United States authorizes the supreme court 'to issue writs of mandamus, in cases warranted by the principles and usages of law, to any courts appointed, or persons holding office, under the authority of the United States.' . . . The constitution vests the whole judicial power of the United States in one supreme court, and such inferior courts as congress shall, from time to time, ordain and establish. This power is expressly extended to all cases arising under the laws of the United States; and consequently, in some form, may be exercised over the present case; because the right claimed is given by a law of the United States.

"In the distribution of this power it is declared that 'the supreme court shall have original jurisdiction in all cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be a party. In all other cases, the supreme court shall have appellate jurisdiction.'

"It has been insisted at the bar that as the original grant of jurisdiction to the supreme and inferior courts is general, and the clause assigning original jurisdiction to the supreme court contains no negative or restrictive words, the power remains to the legislature to assign original jurisdiction to that court in other cases than those specified in the article which has been recited, provided those cases belong to the judicial power of the United States.

"If it had been intended to leave it in the discretion of the legislature to apportion the judicial power between the supreme and inferior courts according to the will of that body, it would certainly have been useless to have proceeded further than to have defined the judicial power, and the tribunals in which it should be vested. The subsequent part of the section is mere

surplusage, is entirely without meaning, if such is to be the construction. If congress remains at liberty to give this court appellate jurisdiction where the constitution has declared their jurisdiction shall be original, and original jurisdiction where the constitution has declared it shall be appellate, the distribution of jurisdiction made in the constitution is form without substance. . . . When an instrument organizing fundamentally a judicial system divides it into one supreme and so many inferior courts as the legislature may ordain and establish, then enumerates its powers, and proceeds so far to distribute them as to define the jurisdiction of the supreme court by declaring the cases in which it shall take original jurisdiction, and that in others it shall take appellate jurisdiction, the plain import of the words seems to be, that in one class of cases its jurisdiction is original, and not appellate; in the other it is appellate, and not original. If any other construction would render the clause inoperative, that is an additional reason for rejecting such other construction, and for adhering to the obvious meaning.

"To enable this court then to issue a mandamus, it must be shown to be an exercise of appellate jurisdiction, or to be necessary to enable them to exercise appellate jurisdiction.

"It has been stated at the bar that the appellate jurisdiction may be exercised in a variety of forms, and that if it be the will of the legislature that a mandamus should be used for that purpose, that will must be obeyed. This is true; yet the jurisdiction must be appellate, not original.

"It is the essential criterion of appellate jurisdiction that it revises and corrects the proceedings in a cause already instituted, and does not create that case. Although, therefore, a mandamus may be directed to courts, yet to issue such a writ to an officer for the delivery of a paper is in effect the same as to sustain an original action for that paper, and therefore seems not to belong to appellate but to original jurisdiction. Neither is it necessary in such a case as this, to enable the court to exercise its appellate jurisdiction.

"The authority, therefore, given to the supreme court, by the act establishing the judicial courts of the United States, to issue writs of mandamus to public officers, appears not to be warranted by the constitution." (Reprint, vols. 5-6, pp. 66-68.)

*In re* Burnette.

The statute in question does no more than to pro-vide in part a special method for bringing disbarment cases to this court for consideration according to its constitutional jurisdiction, which includes nothing except a revision of errors appearing upon the record and power to enforce the decision rendered. There-fore, the judgment upon the first appeal remanding the cause was valid, and invested the district court with authority to proceed as directed.

At the second trial appellant objected to the jurisdiction of the district court, and after conviction moved an arrest of judgment, because the accusation had been transmitted to this court on appeal, and was not then technically on file in the district court. It is true that this court made no special order relating to the transfer of the original papers to the district court and their custody pending the proceedings there. But this fact did not deprive the district court of jurisdiction. When the cause was remanded the district court had the same jurisdiction it originally possessed, and the absence of the accusation from its files could not terminate its authority. The accusation having once been filed in the district court, no useful purpose could be subserved by refiling it. The reason for requiring papers to be filed is to preserve their identity, and to afford them the protection secured to court records. So long as the accusation was in official custody this purpose was accomplished. It is true that the original papers ought to be present in the district court during the trial, in order that the court and the parties may be able to conduct and verify each step of the proceeding by them. The record indisputably shows that the original papers in this case not only were present in the district court at the trial, but that counsel for appellant used the accusation in the cross-examination of a witness, and introduced another original paper in evidence. What danger to the appellant would have been circumvented if the accusation had been refiled,

40—73 KAN.

or what embarrassment he suffered because it was not,. he forbears to disclose. The circumstance afforded no ground whatever for assailing the jurisdiction of the district court. It did serve the appellant, however, as a flimsy pretext for not answering the accusation, and for refusing to give testimony regarding the nefarious transaction disclosed by the evidence adduced by the prosecuting committee.

The legal sufficiency of the evidence to support the findings of the trial court is challenged. The charge against Burnette, briefly stated, is that he manufactured a spurious letter to be used as evidence on the trial of a civil action in the district court of Sumner county, and at such trial, as a witness, falsely swore to the genuineness of the letter. On July 21, 1902, May Randolph brought a suit in the district court of Sumner county against Eli McCaulley and others for the specific performance of a contract for the sale of land. It was necessary to make out the alleged contract from letters written by Burnette to McCaulley and answers thereto by McCaulley to Burnette. On May 30, 1902, Burnette reported a sale, and among other things said:

"I started to make out a deed for the place but discovered that I did not know the names of all the parties who should sign the deed; consequently I have made out a list of the heirs as best I could and herewith enclose them on a separate sheet. I wish you would examine the names of these parties on this separate sheet and those that I have not completed I wish you would complete if you can and return them to me."

On June 4 Burnette wrote again:

"Please send me list of heirs, stating whether they are married or single, and if married give the names of their husband or wife, as the case may be, so that I can make out deed at once. I sent you a statement in my last letter of this kind for you to fill out, but it seems that you overlooked it. Deed cannot be made until I have the names of the parties who are going to give the deed."

*In re* Burnette.

Other letters passed between the parties. Mr. Ed. T. Hackney represented Randolph, and copies of the letters Burnette had written to McCaulley, made from Burnette's letter-press copies, were given to him. The original letters McCaulley had written were also given to him. Mr. Ivan D. Rogers represented McCaulley, and received from his client the letters Burnette had written.

Preparatory to the trial. the attorneys for the respective parties agreed that the correspondence might be introduced without preliminary proof. To avoid mistake Hackney and Rogers checked over the correspondence, and Rogers was not informed of any letter of May 31, 1902. Shortly before the trial Rogers went to Burnette's office and told him he wanted to be sure he had all of Burnette's letters to McCaulley, and asked him to get his letter-book, so the fact could be determined, as he ·wanted to be sure. Burnette took his letter-book, Rogers held his letters, and the two went through them to ascertain the fact, and no copy of any letter of May 31, 1902, was pointed out to Mr. Rogers. When the trial occurred, on May 29, 1903, a purported copy of a letter from Burnette to McCaulley, dated May 31, 1902, containing important matter bearing upon the rights of the parties, was offered in behalf of the plaintiff. Objection was made because no such letter had ever been heard of by the defendant's counsel prior to that time. Burnette was sworn as a witness and testified that he had corresponded with McCaulley; that his stenographer kept copies of his letters to McCaulley; that the letters in a letter-book produced were copied in the order in which they were written; that he wrote a letter of May 31, 1902, corresponding to a copy contained in the book; that he kept a copy of that letter; that the copy in the book was correct; and that the letter was mailed to McCaulley. He further stated that in making copies of letters for Mr. Hackney he

made copies of the letters relating to the sale as shown by the letter-press book. The court prudently adjourned the case to a later date.

On August 6, 1903, when the trial of Randolph against McCaulley was resumed, Burnette declined to testify, on the ground that his testimony might incriminate him. He did testify, however, that he dictated the letter of May 31, 1902, to his stenographer, Miss Barnes. He was not pressed to state when or under what circumstances the dictation occurred.

On August 6, 1903, the accusation involved in this proceeding was prepared and verified, and on the next day it was presented to the court. On September 2, 1903, the first judgment in disbarment was rendered. On September 4 an application was made to set aside the judgment, and the court made an order that if before September 8 an answer should be filed containing a defense to the accusation the judgment would on that day be set aside. On September 4 Burnette subscribed and swore to an answer to the accusation before a notary public, which answer gave a detailed account of the writing of the spurious letter in his office and the making of the copy of it in his letter-book some time in the month of August, 1902. These acts, however, although committed in his presence, were attributed to another person. Various conversations with the party charged to be the actual writer, relating to the transaction, were narrated, and the following admission was made:

"That some time afterward, along in the first days of September, 1902, this respondent made a lead-pencil copy of said letter on a piece of typewriting paper and dictated the same from said copy to said Morah Barnes, who was at that time a stenographer in the office of Elliott & Burnette; that this respondent shortly afterward told said Morah Barnes that she need not write said letter and she could tear it up or scratch it out. The dictation of said letter to said Morah Barnes was done at the request and the suggestion of ———— [the person charged with writing the letter] and so said

Morah Barnes could get and would be under the impression, and of the opinion, that she had written such a letter in which the name of Randolph was mentioned."

The answer concluded with the statement that while on the witness-stand in the trial of Randolph against McCaulley the accused did not intend to say he wrote or dictated the letter of May 31, 1902, or that he copied it in his letter-book. When Burnette presented himself before the notary to be sworn to this document he asked the officer to read it, which he did. The paper was discussed between them, and the notary hesitated to have any relation to it because it implicated other persons and he feared it would cause trouble. On the same day Burnette gave an interview to Mr. H. L. Woods, editor of the Wellington *Daily News,* containing the same facts which were embodied in the answer, but somewhat more in detail. A portion of the interview reads as follows:

" 'On one of these occasions ——— said that he would write and copy the letter and he and Randolph would take the witness-stand when the suit came up and swear that they knew the letter was written before the suit was filed because they saw it. I finally yielded, and ——— sat down to write the letter on our typewriter.' . . . 'Who changed the figures in the index in the letter-book?' Burnette was asked. 'Those changes I made. I think it was along in February or March this year. I had given Miss Barnes orders to make copies of all the McCaulley letters, and when this letter was not copied I thought it would be well to change the indexing so that the letter would show. The figures are mine and I scratched the others out.' "

The interview was printed in the evening issue of the paper named. On the evening of September 5 Burnette left the state, after making an effort to conceal the fact that he was going, and did not return until March 4, 1904. On his return he published the contents of his answer in the disbarment proceedings (which, however, had never been filed) in the petition

filed against Mr. C. E. Elliott, which was considered by this court in the case of *Elliott v. Burnette*, 72 Kan. 624, 84 Pac. 374. In this petition he denied the truth of the facts he had sworn to in the answer, and asseverated the genuineness of the letter of May 31, 1902.

Meanwhile Mr. Woods had been arrested for libel, by the party implicated by Burnette, on account of the publication of Burnette's interview. On the trial of the libel case Burnette was a witness. He admitted the conversation with Woods on the morning of September 4, 1903, examined a copy of the Wellington *Daily News* of that date, and stated that it contained the substance of such conversation, but declined to say whether the matter was true because it might incriminate him. He did, however, make the following further significant admissions:

"Ques. Do you refuse to testify on the ground that your testimony in regard to the statement made to Mr. Woods would tend to incriminate you because of your testimony on the trial of Randolph against McCaulley? Ans. I do. I think it might; yes, sir. Let me see that paper. ("Exhibit C" handed to witness.) I think I can testify to parts of that article, except to the part that has to do with the writing or copying and the mailing of the letter.

"Q. Was there a conversation between you and ———— in regard to writing a letter to Eli McCaulley and dating it back at any time after the suit of Randolph against McCaulley had been brought? A. There was.

"Q. Where did that conversation take place? A. Took place in our office.

"Q. Office of Elliott & Burnette? A. Yes, sir.

"Q. Was Mr. Elliott there? A. No, sir.

"Q. Was Morah Barnes there? A. No, sir."

"Q. Did you and ———— have any conversation in regard to the letter, or copy of the letter, dated May 31, 1902, purporting to have been addressed to Eli McCaulley and written by you, after the 29th of May, 1903, and prior to the 6th day of August, 1903? A. Did we have any conversations?

"Q. Yes, sir. A. Yes, sir.

"Q. How many conversations did you have? A.

*In re* Burnette.

Well, of course, I would n't undertake to say how many, but then there were fifteen or twenty, I should judge, at different times between those dates."

It is of course plain to every lawyer that there could be no occasion for talking about writing a post-dated letter if the letter of May 31, 1902, were genuine. A genuine letter would not have aroused the feverish agitation which led to fifteen or twenty consultations about it. If the letter had been genuine a copy of it would have been given to Hackney, who would have shown it to Rogers when they were checking up the correspondence; and Burnette would have called attention to its absence when Rogers was checking up the correspondence to be sure he had it all. Not being genuine it was necessary to conceal it from Rogers until the trial; else Rogers would have had time to interrogate his client, a non-resident of the state, and the scheme would have failed or would have been exposed. Burnette's letter to McCaulley of May 30 contained the list of heirs. His letter of June 4 referred to that letter as the last, and left no room for one of May 31.

These facts are all inconsistent with the genuineness of the disputed letter. They are consistent with the interview with Woods, and with the disbarment answer. The statements in the petition against Elliott were probably inserted in a floundering attempt on the part of Burnette to rehabilitate himself after he had absconded and returned. Whether Burnette fabricated the letter alone, or had a confederate, is immaterial. The court was abundantly justified in finding the accused guilty, and its conclusion is fortified by the failure of Burnette to interpose in court any single written or oral statement, either in denial or explanation of the facts charged against him, from the day the accusation was filed to the present time. (*Matter of Randel,* 158 N. Y. 216, 52 N. E. 1106; *In re Wellcome,* 23 Mont. 450, 468, 59 Pac. 445; *Ex parte Thompson,* 32

*In re* Burnette.

Ore. 499, 52 Pac. 570, 40 L. R. A. 194; *The People v. Webster,* 28 Colo. 223, 225, 64 Pac. 207.)

Some objections to the admission of evidence are argued. The disbarment answer was proved, after the original had been traced into Burnette's possession, by a copy taken by one of his attorneys, who furnished it to the prosecuting committee. It is claimed the paper was privileged. As already shown, Burnette published the matter contained in this answer to the notary who administered the oath to him. He published the same matter to Woods. He again published it in his petition against Elliott. It was then no longer private or confidential or privileged. Whenever a party to a cause voluntarily solicits and procures the reading of his unfiled pleading by a non-professional stranger, bruits it in a newspaper interview, and blazons it upon the records of a court of general jurisdiction in another pleading filed against the attorney who assisted in preparing it, the privileged character of the document is waived; it then becomes common public property; the attorney is released from the confidential relation he bore to it prior to its publication, and his production of a copy of it which he has retained, for use as evidence in a subsequent proceeding brought against the party, is not a breach of privilege. (*In re Elliott, ante,* p. 151.) If any decided cases have attempted to make the rule of privilege a byword by holding to the contrary, they are disapproved.

The newspaper interview with Woods was proved by an identified copy of the Wellington *Daily News* of September 4, 1904. It having been shown that on the trial of the libel suit, after inspecting that issue of the paper, Burnette declared he made the statements it contained, the paper was the best evidence. This interview constituted an admission that the letter of May 31, 1902, was not genuine, and the fact that on the trial of the libel case Burnette declined to answer respecting its truth did not affect its admissibility.

The judgment of the district court of Sumner county revoking the license of Cleo D. Burnette to practice as an attorney and counselor at law in the courts of Kansas is affirmed.

All the Justices concurring.