THE STATE OF KANSAS, *ex rel. Fred S. Jackson, as Attorney-general,* v. THE ANHEUSER-BUSCH BREWING ASSOCIATION.

No. 15,488. (90 Pac. 777.)

SYLLABUS BY THE COURT.

JURISDICTION — *Supreme Court — Injunction — Appointment of Receiver.* This court has original jurisdiction in proceedings in *quo warranto,* mandamus and *habeas corpus* only. It has no original jurisdiction to issue injunctions or to appoint receivers. But in order to protect, preserve and render effectual its original jurisdiction the court may restrain the use and transfer of property and appoint a receiver for property owned and employed by a foreign brewing company unlawfully conducting its business in this state, pending proceedings in *quo warranto* to oust it.

Original proceeding in *quo warranto.* Opinion filed June 8, 1907. Judgment for plaintiff.

*Fred S. Jackson,* attorney-general, and *John S. Dawson,* assistant attorney-general, for The State.

*Rossington & Smith,* for defendant; *Nagel & Kirby,* of counsel.

The opinion of the court was delivered by

BURCH, J.: The state of Kansas, on the relation of the attorney-general, brings this action to oust the defendant from exercising corporate franchises within the state. The defendant is a corporation of the state of Missouri whose corporate purpose, as stated in its charter, is "the brewery business and the business appurtenant thereto, and the buying, making and selling of beer."

The petition alleges that the defendant has obtained no permission from the charter board of the state of Kansas to transact business within the state, and has no authority to do so, but that, through its agents, it engages in the sale, barter and delivery of intoxicating liquors in the state, keeps and maintains places within the state where intoxicating liquors are sold, bartered and given away, and keeps and maintains places where persons are permitted to resort for the purpose 'of drinking intoxicating liquors, all contrary to law, and in the conduct of such unlawful business it holds and owns real and personal property, and owns and uses bars and all manner of saloon fixtures.

The prayer of the petition is that the defendant be required to show by what warrant it exercises the corporate franchises described, and by what warrant it holds real and personal property in the state; that it be ousted, prohibited and restrained from the exercise of the corporate powers and franchises which it has exhibited within the state; that such franchises be assumed by the state; that a receiver be appointed for the defendant's property in the state; that such property be seized as the public property of the state of Kansas, to be disposed of in a manner to secure the rights of creditors and of the state; and that pending the proceeding the defendant be restrained from removing or disposing of its property and from continuing to use it for unlawful purposes.

At the time the proceeding was commenced similar

petitions were filed against a number of other foreign brewing companies. The petitions were duly verified, but the court required a further showing to be made in support of the applications for restraining orders. This showing was duly made. The details need not be stated. It sufficiently appeared that the exercise of corporate franchises within the state was accomplished through the instrumentality of real and personal property which was devoted to unlawful uses; that whenever attempt was made by officers of the law to circumvent such uses all manner of shifts, devices and subterfuges were resorted to for the purpose of keeping such property in unlawful employments; and that among those devices was the passing of such property from one agent to another in persistent attempts to defeat the enforcement of the laws of the state.

Restraining orders were issued in all the cases, and the applications for receivers were set down for hearing upon notice. At the hearing evidence was introduced on the part of the state which left the court in some doubt respecting the good faith of the conduct of the defendant in this case after the service of the restraining order. The court was not satisfied that property belonging to the defendant was not still being made the instrument for the exercise of corporate franchises contrary to law, and it was not certain that property belonging to the defendant was not being placed colorably in the ownership and possession of others so that after a judgment of ouster, if such should be the result of the action, it would continue to accomplish an unlawful usurpation of corporate privileges.

At the preliminary hearing the defendant greatly accelerated the proceeding by making a final submission of the cause upon an answer and an affidavit containing proposals respecting the withdrawal of its property from the state.

The court having convened for the special purpose of hearing the application for provisional relief, and

the merits of the case not being determinable in the orderly course of the court's work for some time, the application for the appointment of a receiver was granted and receivers for the defendant's property were appointed pending the consideration of the cause.

The authority of the court to seize the property of a defendant before final judgment in a *quo warranto* proceeding was vigorously contested as a breach of constitutional jurisdiction and a depredation upon the right of private property. It is proper, therefore, that, before rendering final judgment, the reasons for the court's conduct be stated.

It is always a delicate matter for a court of last resort to interpret its own jurisdiction. Pride of place, lust of power, zeal for spectacular innovation and other weaknesses which exhibit themselves with sufficient frequency in those having authority may be tolerated for a time in other departments of government, however much they may be deplored, without registering lasting effects. But the administration of justice cannot be scandalized by usurpation of power without irreparable harm, and any act of a court from whose judgment there can be no appeal which proceeds from will or pleasure or other unjudicial motive inflicts an incurable wound upon free institutions. And no palliation for unauthorized stretches of power can be found in the fact that the person or corporation against whom it is directed is itself engaged in the most contemptuous disregard of law.

Ours is a constitutional government. The people are sovereign, and in the adoption of a constitution they have carefully limited the scope of the authority vested in the various agencies of government. More than this, they have limited even their own power. Doubtless there are vast funds of power resident with the people upon which they have not yet drawn, but until an amendment of the constitution takes place the people themselves cannot lawfully make use of them. Much less can legislative, executive or judicial officers,

whose authority is derived solely from the constitution, lay hands upon them, and if they should attempt to do so they gain no increment of lawful power. Thomas M. Cooley, whose competency to speak will scarcely be questioned, has said:

"The theory of our political system is that the ultimate sovereignty is in the people, from whom springs all legitimate authority. The people of the Union created a national constitution, and conferred upon it powers of sovereignty over certain subjects, and the people of each state created a state government, to exercise the remaining powers of sovereignty so far as they were disposed to allow them to be exercised at all. By the constitution which they establish they not only tie up the hands of their official agencies, but their own hands as well; and neither the officers of the state, nor the whole people as an aggregate body, are at liberty to take action in opposition to this fundamental law." (Cooley's Const. Lim., 7th ed., 56.)

The question is, therefore, Under the constitution of the state of Kansas, what is the jurisdiction of its supreme court in *quo warranto?* The jurisdiction is original, and is established by the constitution itself:

"The supreme court shall have original jurisdiction in proceedings in *quo warranto,* mandamus, and *habeas corpus;* and such appellate jurisdiction as may be provided by law." (Const., art. 3, § 3; Gen. Stat. 1901, § 150.)

There is no definition in the constitution of the phrase "proceedings in *quo warranto.*" The words are used as if their meaning were a matter of common understanding, and there must have existed at the time the constitution was adopted a body of knowledge in which the terms were current and to which resort may be had to ascertain their signification. That body of knowledge was the common law.

When the constitution was adopted various notions were entertained respecting some of the essential common-law features of jurisdiction in *quo warranto.* By some courts it was held that all the virtues of the

ancient prerogative writ of right, the writ of *quo warranto,* still persisted, while it was contended by others that proceedings of that nature had been entirely superseded by informations in the nature of *quo warranto;* and it was the opinion of many that the naming of one remedy differentiated it from the other.    In framing the constitution the purpose appears to have been to confer jurisdiction broadly, and language was chosen which avoided the consequences of this diversity of opinion and authorized all the relief which at common law could be given by a *quo warranto* proceeding of any kind.    Such was the interpretation placed upon the constitution by the legislature of 1868, which in regulating the procedure authorized a civil action in any case in which a remedy might formerly have been obtained either by the writ of *quo warranto* or by an information in the nature of *quo warranto.* The court is of the opinion that this is the correct view, and holds that it possesses all the jurisdiction which the common law afforded in *quo warranto* in any form.

The writ was of a civil nature.    The information in the nature of *quo warranto* was originally criminal in form and purpose, the object of the proceeding being not merely to oust but to fine the usurper.    In the progress of time the fine fell to a nominal amount and its imposition was ultimately discontinued in England, although the practice still prevails in some of the American states.    Therefore through a gradual process of evolution the procedure by information became essentially civil in character.    (*The State, ex rel., v. Foster,* 32 Kan. 14, 41, 3 Pac. 534.)    In no case was it used as an adjunct of the criminal law generally, and in seizing the property of the defendant in this case the court had no purpose to distort the procedure into a mere auxiliary of the prohibitory liquor law.

The proceeding, whether by original writ or by information, was a feature of a legal system in which law and equity were sharply distinguished and administered in different courts, and it was always insti-

tuted and maintained in a court of law. By the grant of jurisdiction in proceedings in *quo warranto* no equity jurisdiction was conferred upon the court, and the right to appoint a custodian of the defendant's property pending the hearing, who for convenience is called a "receiver," was not sought to be derived from the practice prevailing in matters relievable and cognizable only in courts of equity.

Receivers for the defendant's property were not appointed for the ultimate purpose of confiscation or other appropriation, except to such an extent as might be necessary to prevent the defendant from rendering ineffectual a judgment for costs. There is no law of the state transferring to itself the title to property of a corporation which has unlawfully usurped franchises, and without such a law the court cannot enter a judgment of forfeiture. "The court has no power to create a forfeiture, and no power to declare a forfeiture where none exists." (*The State, ex rel., v. Wilson*, 30 Kan. 661, 2 Pac. 828.)

Even if the defendant were ousted from certain franchises wrongfully exercised it would continue to be a corporation, and its property would still belong to it for the prosecution of all enterprises in which it might lawfully engage elsewhere. If all its franchises were seized and the corporation dissolved the further conduct of business would necessarily cease, but the claims of creditors upon the corporate assets could not be annihilated, and the residue upon the winding up of the concern would belong to its stockholders. All this is elementary (*State Bank v. The State*, 1 Blackf. [Ind.] 267; *The State v. The West Wisconsin Railway Company*, 34 Wis. 197, 215; *People v. O'Brien et al.*, 111 N. Y. 1, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684), and at the hearing of the cause the attorney-general asserted no right of confiscation on behalf of the state.

From what source, then, is the power which was exercised to be derived, and to what end was it exer-

cised in this proceeding? No principle of the common law is better established than that plenary power is vested in all courts to protect and preserve their jurisdiction so that the exercise of granted functions may be made effectual, and in this case that power was exercised to prevent the defendant, by manipulations of property which it could not lawfully hold, from circumventing an actual ouster and rendering the whole proceeding a solemn farce, the expenses of which should be borne by an outraged commonwealth. This power the defendant concedes in its brief:

"It cannot be ousted from its franchises to do business. It can only be forbidden to do business within the borders of the state of Kansas, and orders that are necessary to accomplish that end are the only orders that it is the province of the court within the terms of its jurisdiction to make. Indeed, it cannot be concerned with reference to its property that it may have brought into the state, except to see and to insure by its orders that that property shall not be used for an unlawful purpose or for a continuation of the business in which it is engaged."

The exercise of jurisdiction of this character is in no sense new or strange. This court has no original jurisdiction to issue injunctions or writs of prohibition. It has original jurisdiction in mandamus, a prerogative proceeding which under the common law was prosecuted in the court of king's bench. An original action of mandamus was brought here to compel the issuance of bonds by a county board. Meantime a local suit had been commenced to restrain the issuance of such bonds, and an application was made for a restraining order to prohibit the further prosecution of the injunction suit pending the determination of the mandamus proceeding. In the opinion vindicating the power of the court to protect its own jurisdiction in this manner it was said:

"The *original* jurisdiction given by the constitution to the supreme court is *specific* and *named,* while the *appellate* jurisdiction is such as may be provided by

law. Hence, with respect to the original jurisdiction that may be exercised by the supreme court, it would seem that it was the intention of the authors of the constitution that the supreme court should exercise only just such original jurisdiction as is prescribed by the constitution, and not any more nor any less; and that, as neither *prohibition* nor *injunction* is named or mentioned in the constitution, such matters cannot rightfully come within the original jurisdiction of the supreme court. But this will not prevent the supreme court from exercising jurisdiction with regard to such matters where they are mere incidents or auxiliaries necessary for the rightful and proper exercise of the jurisdiction actually conferred upon the supreme court by the constitution and statutes. Inherently the supreme court must have the power to protect its own jurisdiction, its own process, its own proceedings, its own orders, and its own judgments; and for this purpose it may, when necessary, prohibit or restrain the performance of any act which might interfere with the proper exercise of its rightful jurisdiction in cases pending before it. It can hardly be supposed that the action of the supreme court may be thwarted, impeded or embarrassed by the unwarranted intermeddling of others without any power in the supreme court to prevent it." (*C. K. & W. Rld. Co. v. Comm'rs of Chase Co.*, 42 Kan. 223, 225, 21 Pac. 1071.)

In Ohio the constitutional jurisdiction of the supreme court is the same as that of this court, except that *procedendo* is added. In a *quo warranto* proceeding an injunction was asked to protect the subject-matter of the litigation pending the hearing. The court said:

"It is urged that we are without authority to make the order which the motion contemplates. The present action is a resort to our original jurisdiction. That we have not original jurisdiction of suits for injunctions is entirely clear. If the language of section 5573, Revised Statutes, should be thought appropriate to confer it, the effect to be given to that section would, nevertheless, be indicated by section two of article four of the constitution, which ordains that 'it [the supreme court] shall have original jurisdiction in *quo warranto*, mandamus, *habeas corpus* and *procedendo*,

and such appellate jurisdiction as may be provided by law.' Applying to this grant the maxim, *expressio unius est exclusio alterius,* the conclusion is irresistible that the general assembly cannot add to the enumerated subjects of our original jurisdiction. *Marbury v. Madison,* 1 Cranch (U. S.), 137, 2 L. Ed. 60; *Kent v. Mahaffy,* 2 Ohio St. 497. But our original jurisdiction in *quo warranto* is not doubted, and we have to inquire whether the desired order may be made in its exercise. In the consideration of that question the case of *Yoeman v. Lasley,* 36 Ohio St. 416, is suggestive. . . . The pertinent inference from the case cited is that a court has authority to make any judicial order which, from the nature of the case, may be necessary to the effective exercise of its jurisdiction, whether original or appellate. Jurisdiction is the power to hear and determine the subject-matter in controversy between the parties to a suit. Authority to determine is exercised in the form of judgments, decrees, and orders, and it implies power to make all such orders as may be appropriate to the case presented and necessary to give practical effect to the final judgment, as well as to preserve the subject of the action, pending the final determination of the case." (*State v. Board,* 70 Ohio St. 341, 348, 349, 71 N. E. 717.)

In the case of *The Columbian Athletic Club v. State, ex rel. McMahan,* 143 Ind. 98, 40 N. E. 914, 28 L. R. A. 727, 52 Am. St. Rep. 407, *quo warranto* was brought for the forfeiture of corporate franchises which were being usurped. The property of the defendant was being put to unlawful uses to the common nuisance of the people in its vicinity. An injunction was asked and granted and a receiver was appointed upon an application showing that fraudulent transfers were likely to be made to perpetuate the wrongs complained of. Objection was made to the order appointing a receiver. The syllabus of the case reads:

"An injunction against the abuse of corporate privileges by conducting prize-fights will not be denied because the wrongful acts constitute crimes.

"A receiver of the property of a corporation which has forfeited its franchise by unlawfully conducting

13—76 KAN.

prize-fights may be appointed to hold the property subject to the order of the court, when necessary to aid an injunction against the further unlawful use of the property."

In the opinion it was said:

"So here, while it is perhaps true that the commission of crime, strictly speaking, cannot be enjoined, yet the transfer of property for fraudulent purposes, or to evade the processes of the court, or to prevent the execution of its decree, may be enjoined. If this corporation might transfer its rights, franchises and property to another company or to individuals during the pendency of this action, and so continue the perpetration of the acts complained of in the very face of the court, it would be but a mockery of justice to have instituted the action in the first place. This is a proceeding against property as well as against the corporation. The property itself is criminal and can be used only for criminal purposes. If there be any virtue in the *quo warranto* proceeding, it must result not only in the dissolution of the corporation but also in the discontinuance of the use of its property for the evil purposes to which it had been prostituted." (Page 105.)

Seizures of the lands and chattels of defendants in *quo warranto* at common law for the purpose of aiding jurisdiction were an acknowledged feature of the proceeding. In early times the contumacy of defendants who unlawfully usurped franchises seems to have extended chiefly to evading the requirement to appear and show "*quo warranto*," etc. Therefore disobedience of process was followed by a *distringas,* upon which lands and goods were seized until the defendant appeared and submitted to the jurisdiction of the court. (See note in 4 Cow. [N. Y.] 100.)

It requires no subtlety of analysis to find here every vital element of the principle involved in the impounding of the property of the defendant in this case. The application of the principle is novel only in that it is made to reach the exigencies of new and unanticipated states of fact, and in the adaptation of ancient rem-

edies to modern uses the substance of jurisdictional authority is the essential thing to be regarded. In the beginning the power of the court was adequate to make jurisdiction in *quo warranto* effective, and that power the attrition of time has never lessened.

It is urged, however, that in the code of civil procedure (§ 659; Gen. Stat. 1901, § 5155) the legislature has authorized the court to restrain the disposition of the property of a corporation and to appoint a receiver for such property after judgment in *quo warranto,* and hence that such orders before judgment are impliedly prohibited. The court needs no assistance from the legislature to enable it to exercise its constitutional jurisdiction in *quo warranto.* If so its power would be completely emasculated if the legislature failed or refused to act. (*The State, ex rel. v. Allen,* 5 Kan. 213; *The State of Florida v. William H. Gleason,* 12 Fla. 190; *State v. Messmore,* 14 Wis. 115; *The People, etc. v. Boughton,* 5 Colo. 487; *Commonwealth of Ky. v. Dennison, Governor, &c.,* 65 U. S. 66, 16 L. Ed. 717; *State ex rel. Wood v. Baker,* 38 Wis. 71; *The State ex rel. Macklin v. Rombauer,* 104 Mo. 619, 15 S. W. 850, 16 S. W. 502.) And the court will brook no abatement of its authority by the legislature.

It is true that legislative regulations of matters of procedure which do not impair jurisdiction will be recognized and utilized, and the legislature may invent new processes and new forms of remedy calculated to aid the court in the exercise of its jurisdiction, but the jurisdiction itself can neither be augmented nor diminished. (*The State, ex rel. v. Allen,* 5 Kan. 213; *The State, ex rel. v. Wilson,* 30 Kan. 661, 2 Pac. 828; *Auditor of State v. A. T. & S. F. Railroad Co.,* 6 Kan. 500, 7 Am. Rep. 575; *In re Burnette,* 73 Kan. 609, 85 Pac. 575.)

The statute cited serves to illustrate the principle. The court may avail itself of the authority given by the code to make restraining orders and to appoint re-

ceivers to any extent necessary effectually to exercise its constitutional power, but it cannot, under the guise of a statutory *quo warranto,* undertake to entertain general equity jurisdiction over the winding up of the affairs of dissolved corporations.

If the foregoing views are sound, and such is the opinion of the court, the restraining order was lawfully issued and custodians of the defendant's property were rightfully appointed.

Upon the merits of the case the court finds for the plaintiff, and judgment is rendered for the ouster of the defendant and for costs. The defendant is permanently ousted and enjoined from owning, holding or using property, either real or personal, in this state contrary to law, but the restraining order is otherwise vacated. The receivers are continued in office and in possession to execute the judgment.

Saloon fixtures, equipments and paraphernalia, and other personal property employed in and about the unlawful sale or keeping for sale of intoxicating liquors or in keeping places where such liquors are sold or drunk contrary to law, shall, as soon as practicable, be. removed from the state. Personal property whose ordinary use is lawful may be sold or removed from the state at the defendant's option, expressed to the receivers. The receivers may permit removals and sales of personal property to be made by the defendant, but only under their supervision and when satisfied of the good faith of the transaction.

All real estate belonging to the defendant shall be sold. The defendant is allowed a reasonable time in which to make sales, and upon application to the court accompanied by proof of an actual sale in good faith any parcel of real estate will be discharged from the custody of the receivers. If after reasonable opportunity to dispose of it without undue sacrifice any real estate remains unsold, the receivers shall sell it as upon execution and pay the proceeds, after deducting expenses, to the defendant.

The receivers shall reserve and sell as upon execution sufficient property to pay costs and accruing costs, unless the same are voluntarily paid by the defendant.

The receivers shall report their conduct to the court. Applications for allowances and expenses will be determined upon notice to the defendant.